Patricia **SAWYER**, Administratrix of the Estate of Robert H. Sawyer, Deceased, Plaintiff-Appellant,

v.

**UNITED STATES** of America, Defendant-Appellee.

No. 224, Docket 34045.

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 1970.

Decided Jan. 4, 1971.

James A. Dooley, Chicago, Ill. (Clare J. Murphy, Calvin K. Hubbell, Chicago, Ill., James Dempsey, White Plains, N. Y., on the brief), for plaintiff-appellant.

Reed Johnston, Atty., Dept. of Justice (William D. Ruckelshaus, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Edward R. Neaher, U. S. Atty., E.D.N. Y., on the brief), for defendant-appellee.

Before KAUFMAN, HAYS and GIBBONS,* Circuit Judges.

HAYS, Circuit Judge:

On the morning of December 16, 1960, United Airlines Flight 826 (UAL 826), a turbo-jet DC–8 aircraft, collided in mid-air with Trans World Airlines Flight 266 (TWA 266), a propeller-driven aircraft, at an altitude of approximately 5,000 feet above Miller Army Air Base, Staten Island, New York. This tragedy resulted in the death of all 128 passengers and crew members aboard both aircraft. Plaintiff in this case is the wife and administratrix of the estate of the deceased pilot of UAL 826, Captain Robert H. Sawyer. She sued under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1964), alleging that the negligence of the United States government was solely responsible for the accident. The district court denied recovery (297 F.Supp. 324 (E.D.N.Y.1969)) on the ground that plaintiff failed to prove negligence on the part of the government, and that plaintiff's decedent was guilty of contributory negligence. We affirm on the first of these grounds, that the evidence failed to establish the government's negligence.

UAL 826 left Chicago at about 1411 GMT [1] bound for Idlewild Airport (now John F. Kennedy International Airport) in New York. TWA 266 was enroute from Columbus, Ohio to LaGuardia Airport in New York. Both planes were being operated under Instrument Flight Rules (IFR).[2] Under the air traffic

---

\* Of the United States Court of Appeals for the Third Circuit, sitting by designation.

1. Greenwich Mean Time (GMT) is used as the time reference throughout this opinion as that is the time used by all air transport control facilities and is the time shown in all transcripts of all radio transmissions and other conversation recordings introduced into evidence. Eastern Standard Time is 5 hours earlier than Greenwich Mean Time.

2. Aircraft operating under Visual Flight Rules (VFR) were free to do so without an air traffic control clearance or even communication with the Center or other air traffic facility so long as they stayed the required distance above, below or horizontally away from clouds. Regardless of the weather conditions, however, any aircraft having the required equipment could elect to operate under IFR. Both IFR and VFR regulations were prescribed by the FAA, pursuant to Congressional authority given in the Federal Aviation Act of 1958 § 307, 49 U.S.C. § 1348(c) (1964):

> "The Administrator is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of the navigable

642

system, all aircraft operating under IFR in the New York area are provided with air traffic control service by facilities located on the ground. These facilities were operated by the Federal Aviation Agency pursuant to Section 307(b) of the Federal Aviation Act of 1958, 49 U.S.C. § 1348(b) (1964). The New York Route Traffic Control Center was physically located in a building at Idlewild Airport. This Center had jurisdiction over a domestic area within a radius of approximately 100 miles from a point in Central Pennsylvania. The airspace within the Center's jurisdiction was divided into approximately 18 sectors, each one of which was manned by one to five people designated as Controllers, Assistant Controllers, or Coordinators. Under procedures prescribed by the Federal Aviation Agency, it was the duty of the traffic controller to issue clearances to aircraft in his sector. These clearances provided for separation from all other known IFR aircraft in that sector in accordance with fixed minimum standards, which required at least 1,000 feet vertical separation, or 10 minutes of longitudinal separation if the aircraft did not have vertical separation, or a minimum of three miles using radar. It was the procedure for the Center to clear the aircraft to proceed by a specified route to a clearance limit at a "fix" which is a geographical position determined visually, by reference to one or more radio navigational aids, by celestial plotting, or by other navigational device. Once the aircraft was definitely separated from all other aircraft under the Center's jurisdiction, control was transferred to the "Airport Traffic Control Tower" at the airport at which the plane was to land. These facilities were responsible for "Approach," "Local," "Ground" and "Departure" Control service for aircraft operating into, or out of their respective airports in the New York area, Idlewild,

Newark and LaGuardia. Typically such a transfer was effected before the arrival of the aircraft at the previously given clearance limit. The Center Controller would instruct the aircraft to change its radio communication frequency to that assigned to the Approach Control position at the tower, and the crew would then report its altitude and position. If the aircraft had not received a new clearance by the time it reached its clearance limit, it was required to "hold" by flying an elliptical pattern around the "fix" at its last assigned altitude. After two-way communications had been established between the aircraft and the tower, the Approach Controller would complete the transfer of control by issuance of new clearance for the aircraft to proceed on a specified route or "heading" away from the "fix," followed by other clearances to descend and vectors, that is, directions to turn right or left, to direct the aircraft to a final approach course in line with the runway in use, and to provide adequate spacing between it and other inbound aircraft.

Plaintiff, in her amended complaint, charged the defendant with wrongfully operating, maintaining and controlling the New York Terminal Air Traffic facilities so that as a proximate result, plaintiff's decedent was killed. We agree with the trial court's conclusion that plaintiff has not proved negligence on the part of defendant.

UAL 826 entered the area of the Center at a point in Western Pennsylvania, establishing radio communications at approximately 1513 GMT and reporting its altitude at 27,000 feet. The testimony of Captain Jack R. Liebrich, who piloted a National Airlines flight in the same area at about the same time, indicated that the weather conditions were extremely poor and that visibility was almost nil. UAL 826 was cleared to descend to 25,000

airspace, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects."

The IFR regulations in force at the time of the collision were contained in Part 60 of the Civil Air Regulations (14 C.F.R. § 60.40 et seq. (1956 & Supp. 1960)).

feet and at approximately 1516 GMT was issued an air traffic clearance by the air traffic controller at Sector RR–18 in the Center:

> "United eight twenty six clearance limit is the Preston Intersection via jet 60 Victor, Allentown direct Robbinsville, Victor 123 maintain flight level 250."

Preston was an air navigation "fix" near the north coast of New Jersey determined by cross bearings on ground radio transmitters. UAL 826 acknowledged receipt of this clearance and repeated it back. When the aircraft reached Allentown it was cleared to descend to 13,000 feet and instructed to change its radio frequency to that used by another sector at the Center, designated RR–5. UAL thereafter established radio and radar contact with Controller Ronald DiGiovanni who identified the craft as a "blip" on his radar scope. At 1525 GMT, DiGiovanni issued a revised clearance to UAL 826:

> "826 cleared to proceed on Victor 30 until intercepting Victor 123 and that way to Preston it will be a little bit quicker."

This clearance shortened the route to Preston by 11 miles and was acknowledged and accepted by the crew of UAL 826. At approximately 1530 GMT, UAL 826 was cleared to descend to and maintain 5,000 feet, and the reply from the crew indicated that they would attempt to achieve that altitude by the time they arrived at the Preston clearance limit. At 1532 GMT, DiGiovanni again reminded UAL 826 of the procedure to be followed at the clearance limit:

> "United 826 if holding is necessary at Preston, southwest one minute pattern right turns on the zero radial of Robbinsville. The only delay will be in descent."

These instructions, again acknowledged by the crew, meant that UAL was to hold at Preston by flying an elliptical pattern until further clearance to proceed beyond Preston was issued. UAL 826 was subsequently told to change to another radio frequency and contact Idlewild Approach Control, which it did, reporting that "it was approaching Preston at 5,000." Idlewild replied with weather information. No further communication between the aircraft and the Approach Control was made; no clearance to proceed beyond the clearance limit was ever issued to UAL 826. Nevertheless, the aircraft proceeded approximately 11 miles past the Preston clearance limit and collided with TWA 266. Since the holding airspace pattern area for Preston extended four miles northeast of the Preston intersection, UAL was approximately seven miles past its clearance limit at the time of the collision.

TWA 266 had been cleared by the New York Air Route Traffic Control Center to the Linden intersection, and was told by the Center to change its radio to the LaGuardia Approach Control frequency shortly before arriving at Linden. After two-way radio communications were established, Approach Control issued a series of vectors to TWA 266 for the purpose of directing it to intercept the Instrument Landing System localizer for a landing on runway 4, and to provide proper spacing between it and surrounding traffic. The last clearance issued to TWA 266 was to descend to 1500 feet, and, so far as can be determined, the aircraft was complying with each of the vector and altitude clearances when the collision occurred.

Plaintiff claims that various acts of the air traffic personnel at the Center, at Idlewild, and at LaGuardia constituted negligence. She alleges that Controller DiGiovanni was negligent in not telling UAL 826 to change its transponder code [3] to the Idlewild Approach Control, in not giving a radar "hand-off" [4] when he

---

3. A transponder is a device on an aircraft producing a definite distinctive slash-type "blip" on radar scope.

4. A radar "hand-off" is a procedure by which radar identification of an aircraft is made from one controller to another without interruption of radar flight following.

switched the craft from the Center, and in permitting UAL 826 to fly past the Preston holding area. We find that no negligence on the part of DiGiovanni was established. Although he admittedly did not tell UAL 826 to change its transponder code, the testimony of Wayne Hendershot, Chief Air Traffic Division, FAA Eastern Region, indicates that the code was to be changed only if the airport was using the beacon[5] or if Approach Control requested the Center to change the code. No such request was made; nor was the beacon being used on that day. As to the allegations with respect to the over-flight of UAL 826, they are based on the assumption that Controller DiGiovanni had the responsibility to know where the aircraft was in relation to a geographic position and to insure that the aircraft complied with its clearance limit. This was not the case. His obligation was to provide separation between aircraft within his sector, that is, to insure their position with respect to each other in accordance with the standards earlier described. Hendershot's testimony indicates that the cooperative nature of the air traffic control system required that the ground controllers assume that pilots of IFR aircraft would adhere to the clearance limits which they had received. Finally, there is no evidence on which to base a conclusion that a radar "hand-off" was either a necessary or usual procedure.

Plaintiff next claims that certain acts of Controller Brown at the Center amounted to negligence on the part of defendant. She alleges that the estimated time of arrival (ETA) was not adjusted by Brown to reflect the fact that DiGiovanni had shortened the flight pattern to Preston and that Brown failed to press the general relay system (GRS) panel amber light button, a part of the procedure for transferring control of the

flight to Idlewild Approach Control, with sufficient pressure to make it light. Neither of these admitted failures, however, constituted negligence which was the proximate cause of the accident. The only purpose of the ETA information was to assist Idlewild Approach Control in establishing the sequence for traffic inbound to that airport. It was not intended to, and indeed could not, assist in knowing when an aircraft was coming over. The approach controller could do nothing until radio communication was established with the aircraft. As to the GRS light system, it was merely a supplement to the interphone system which was the primary means to effectuate transfer. Since an approach controller would normally do nothing until radio communications were established, and since the flashing amber light would still require the approach controller to await those communications, the only possible effect of the failure to receive the amber light would be a possibility of a delay to the aircraft at its clearance limit.

Finally, plaintiff alleges that the procedure followed by personnel at LaGuardia Approach Control with respect to TWA 266 was negligent. The basis of this contention is that, in effect, Controller Smith spotted an unidentified blip on his radar screen, that he merely indicated this to the crew of TWA 266, and that he, plaintiff alleges, vectored the aircraft right into the oncoming UAL 826. After communications were established between LaGuardia Approach Control and TWA 266, Smith cleared TWA 266 to descend to 6,000 feet. Subsequently, he cleared TWA 266 to turn to the right 130 degrees, advising that this was a radar vector to the final approach course. This was followed by a further instruction to "make that further right 150." The purpose of this latter vector

5. It appears from the record that a control tower may be tuned into a radar signal originating in the aircraft or it may instruct the aircraft to tune into the control tower's "beacon," i. e., a signal originating in the control tower. The evidence of the expert for the government indicates that which is to be used at any given time is largely a matter of judgment under the particular circumstances of individual situations.

**645**

was to increase the separation between TWA 266 and Capitol 132 which was preceding TWA 266 inbound to LaGuardia. When he noticed an unidentified "blip" on his screen he notified the crew; after several more clearances, he again told the crew "Roger, that appears to be jet traffic off to your right now three o'clock at one mile northeast bound." This communication was not acknowledged by TWA 266, and shortly thereafter the "blips" were seen to merge.

There is no proof that Controller Smith was guilty of negligence in this case. His only function was to achieve proper spacing between aircraft within his sector. He was neither instructed nor expected to issue a vector for a different purpose unless the pilot requested it; there was a considerable amount of testimony to this effect. The basic reason for what may at first glance appear to be a somewhat cold procedure is that the radar scope does not provide the controller with any information as to altitude. If aircraft were crossing above or below each other they would appear on the scope to be merging. Indeed there was testimony that the merging of aircraft "blips" on radar scopes was not at all uncommon. The proof clearly establishes that Smith did not have the discretion to change the vectors without a request from the pilot himself; in the absence of such discretion, he fully complied with established procedures and cannot be found negligent.

The trial court found that plaintiff's decedent was contributorily negligent. In view of our decision that plaintiff failed to establish defendant's negligence we need not consider that issue.

Plaintiff contends that the trial judge erred in refusing to allow plaintiff to introduce into evidence proof of Captain Sawyer's careful habits as a pilot. Our holding that defendant's negligence was not established precludes reversal even were we to agree with plaintiff on this point.

Finally, plaintiff contends that the trial judge erred in refusing to apply the doctrine of last clear chance. Since we have not found either the existence of negligence or contributory negligence, that doctrine is irrelevant. See Chadwick v. City of New York, 301 N.Y. 176, 93 N.E.2d 625 (1959).

In view of our decision it is unnecessary for us to pass on appellee's motion to strike the appellant's appendix.

The judgment denying recovery to plaintiff is affirmed.