ALLEGHENY AIRLINES, INC. and
GECC Leasing Corp., Plaintiffs,

v.

UNITED STATES of America et
al., Defendants.

Jill Mary KOHR, Executrix of the Estate
of Robert H. Kohr, Deceased, Plaintiff,

v.

ALLEGHENY AIRLINES, INC., and
United States of America,
Defendants,

v.

FORTH CORPORATION and Lee LeMay,
Administrator of the Estate of Robert
W. Carey, Deceased, Third-Party Defendants.

Nos. IP 70–609–C, 69–431–C.

United States District Court,
S. D. Indiana,
Indianapolis Division.

Oct. 13, 1976.

Walter E. Rutherford, Robert B. Haserot, Haight, Gardner, Poor & Havens, New York City, William V. Hutchins, Locke, Reynolds, Boyd & Weisell, Indianapolis, Ind., for Allegheny Airlines, Inc., and GECC Leasing Corp.

James E. Rocap, Jr., Thomas P. Ledgerwood, Rocap, Rocap, Reese & Young, Indianapolis, Ind., for Forth Corp. and Lee LeMay, Administrator of the Estate of Robert W. Carey, Deceased.

Herbert L. Lyons, Thomas E. Tager, Aviation Section, Civ. Div., Dept. of Justice, Washington, D. C., for U. S.

## MEMORANDUM ENTRY

NOLAND, District Judge.

The above captioned cause numbered IP 70-609-C has been brought by Allegheny Airlines, Inc., (hereinafter Allegheny) and

GECC Leasing Corporation (hereinafter GECC) seeking to recover damages for the loss of a jet aircraft and turbo-jet engine which were destroyed in a mid-air collision between an Allegheny jet aircraft and a Piper Cherokee aircraft. Such mid-air collision occurred on September 9, 1969, in the air space over Fairland, Indiana, and as a result thereof, both aircraft were totally destroyed and all eighty-three (83) occupants thereof were killed. Allegheny seeks to recover from the defendants for the loss of its DC–9–31 jet aircraft ( # N988VJ) while GECC seeks to recover for the loss of its turbo-jet engine ( # P657121D) located on the Allegheny aircraft. Named as defendants herein are the United States, Lee LeMay, Administrator of the Estate of Robert W. Carey, the pilot of the Piper Cherokee aircraft, and Forth Corporation, which owned the Piper Cherokee and operated the facility providing flight instruction to Carey.

Cause Number IP 69–431–C is before the Court on the third-party claims brought by Allegheny and the United States against Forth Corporation and the Estate of Carey seeking indemnity and contribution for all or a portion of the moneys Allegheny and the United States paid in settlement of the wrongful death claims arising out of the mid-air collision. At the conclusion of this entry the Court will make some observations and rulings with respect to issues pending in the indemnity action.

1. The Court's instruction to the jury which set forth the special interrogatories provided as follows:

Your verdict in this case will be in the form of answers to certain questions. When you have unanimously decided upon your answers you are instructed to return them to the Court in writing upon the forms provided for your use. The questions are:

Number 1: Was Allegheny Airlines, Inc. guilty of any negligence which was a proximate cause of the mid-air collision?

_____
(Yes or No)

Number 2: Was the United States of America guilty of any negligence which was a proximate cause of the mid-air collision?

_____
(Yes or No)

Prior to trial the Court consolidated the above captioned causes for purposes of trial. Pursuant to the directive of the Court of Appeals, the indemnity and contribution actions were tried to a jury on a comparative negligence basis. See *Kohr v. Allegheny Airlines, Inc.*, 504 F.2d 400, 405 (7th Cir. 1974), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975). However, Allegheny and GECC's property damage actions against the United States were tried to the Court under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2674, while such actions against Forth Corporation and the Estate of Carey were tried to a jury. Prior to trial the Court agreed with counsel for the parties herein that since the property damage and indemnity actions were being consolidated, the jury's findings in the indemnity action as to the respective negligence of Allegheny, Forth Corporation and Carey would be followed in the property damage action. Similarly, pursuant to the recommendation of the Court of Appeals, see *Allegheny Airlines, Inc. v. United States*, 504 F.2d 104, 111 n. 7 (7th Cir. 1974), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 470 (1975), the jury also acted as an advisory jury in the determination of the respective liability of the parties in the Federal Tort Claims Act suit against the United States.

After hearing the evidence, the arguments of counsel, and the instructions of the Court, the jury returned its findings herein in the form of answers to certain special interrogatories propounded to them.[1]

Number 3: Was Robert W. Carey, the pilot of the Piper Cherokee aircraft, guilty of any negligence which was a proximate cause of the mid-air collision?

_____
(Yes or No)

Number 4: Was the Forth Corporation guilty of any negligence which was the proximate cause of the mid-air collision?

_____
(Yes or No)

If you gave an answer of "Yes" to two or more of the above questions and thereby find that more than one of the parties' negligence caused the mid-air collision, you are to determine the relative fault of each of the parties whom you found to have negligently caused the collision. That is, you must determine what percentage of the total causal negligence in-

By its verdict the jury found Allegheny, Carey, Forth Corporation and the United States to have been guilty of negligence which was a proximate cause of the mid-air collision and assessed the relative percentages as follows: Allegheny 22%; Carey 21%; Forth Corporation 21%; and the United States of America 36%. The Court believes the findings to be reasonable under the evidence presented at trial. Therefore, it will not interfere with such findings and hereby adopts the jury's verdict as its own in resolving Allegheny and GECC's action against the United States of America under the Federal Tort Claims Act.

The Court does believe, however, that it should make some specific findings of fact and conclusions of law with respect to the claims of Allegheny and GECC against the United States of America. Those are set forth hereinbelow. Additionally, many of the undisputed facts concerning this mid-air collision are comprehensively set forth in Judge Swygert's opinion in the first appeal of this cause. See *Allegheny Airlines, Inc. v. United States of America, supra,* 504 F.2d at 107–08. The Court believes that in light of the well-documented history of this case it need only briefly explain herein its conclusions as to the negligence of the United States and Allegheny. Thereafter the Court will explain its reasoning on certain of the other issues raised by the parties herein and enter pertinent findings of fact and conclusions of law in the Federal Tort Claims Act suits.

The Court believes the evidence presented at trial clearly supports the jury's finding that the United States, by and through its agents and employees of the Federal Aviation Administration, was guilty of negligence which was a proximate cause of the mid-air collision on September 9, 1969. Air traffic controller Merrill T. McCammack, who at all times relevant herein was handling the Arrival Radar position in the IFR Room of the Indianapolis Weir-Cook Airport Tower, was responsible for providing Allegheny Flight 853 with air traffic control services from the time he assumed radar control over such flight at approximately 1926:38Z [2] (3:26:38 p. m. Indianapolis time), by accepting the radar "handoff" [3] from the Indianapolis Center, until the time of the collision at approximately 1929:13Z (3:29:13 p. m.). The various duties and responsibilities of air traffic controller McCammack are set forth in the Facility Operations Manual and the Terminal Air Traffic Control Manual. In general, McCammack was required to follow Flight 853 on his radar scope at all times and provide it with the necessary radar services including separation, navigational guidance, monitoring, surveillance, and tracking as those terms are defined in Chapter 1, § 3, para. 20 of the Terminal Control Manual. He was also required to issue safety advisories and traffic information to Flight 853

---

volved is attributable to each party. The total percentage must equal 100%. To make this determination you need simply to answer this question:

Number 5: What percentage of all the causal negligence involved in the mid-air collision do you attribute to:

(a) Allegheny Airlines, Inc.?
(If you answered "No" to question Number 1, insert 0) _____%

(b) United States of America?
(If you answered "No" to question Number 2, insert 0) _____%

(c) Robert W. Carey?
(If you answered "No" to question Number 3, insert 0) _____%

(d) Forth Corporation?
(If you answered "No" to question Number 4, insert 0) _____%

As stated above, your percentages in question Number 5 must total 100%.

2. Greenwich Mean Times are suffixed by the letter "Z" and are expressed in terms of the twenty-four hour clock. Indianapolis Local Time (p. m. Eastern Daylight Time) is included in the parenthesis.

3. A radar "handoff" is the transfer of jurisdiction and control of aircraft between controllers by the use of radar.

which included the distance, type, altitude, direction, and azimuth from Flight 853 of any other airplanes operating in its vicinity. As part of his duty to provide "merging target" services, McCammack was required to advise Flight 853 when its target was likely to merge with another aircraft unless the traffic is known to be separated by more than minimum approved vertical separation. McCammack conceded that he was required to give first priority to the separation of the DC–9 and the Piper Cherokee.

■ The United States stipulated the radar equipment in the IFR Room of the Indianapolis Tower was working satisfactorily at the time of the mid-air collision and that such equipment had the capability of displaying the Piper Cherokee's radar image on the scope during the course of its flight. The Court believes that McCammack's failure to see the radar target for the Piper Cherokee and to properly provide the required radar services to Flight 853 constituted negligence which was a proximate cause of the mid-air collision. This failure on the part of McCammack occurred during the scope and course of his employment with the FAA and his negligence is imputed to the United States under the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2674.

Allegheny presented other evidence in support of its claims of negligence on the part of McCammack in other respects and on the part of other air traffic controllers and employees of the United States. While the Court believes Allegheny established other omissions and violations of the required and recommended procedures with respect to the flights of the Allegheny jet aircraft and the Piper Cherokee aircraft, the Court believes that such violations were not a proximate cause of the mid-air collision.

■ Similarly, in resolving the issue of the negligence of the United States, the Court does not believe that it need make a specific factual finding as to the precise cloud conditions at the time and place of the collision. Regardless of such weather conditions, the Allegheny flight crew had a right to assume that the air traffic controllers in charge of the flight would use reasonable care in the performance of their duties. The failure of McCammack to satisfy such expectations was negligence which proximately contributed to the mid-air collision.

The jury's findings as to the relative negligence of the Allegheny flight crew, Forth Corporation, and Carey impliedly resolve the issue of the weather conditions at the time of the mid-air collision and certain of the important questions derivative thereof, i. e.: Whether the Piper Cherokee was being operated a satisfactory distance from the clouds in accordance with applicable aviation regulations; whether the Allegheny flight crew operated its aircraft in a reasonable and proper manner so as to be able to see and avoid aircraft such as the Piper Cherokee; and whether the agents of the Forth Corporation acted reasonably in permitting Carey's flight on the afternoon of the collision. The Court believes the jury's findings with respect to the comparative negligence of Allegheny, Carey, and Forth Corporation were reasonable in light of the evidence presented.

■ With respect to the property damage claim of Allegheny against the defendants herein, the Court believes the evidence supports a finding that the Allegheny aircraft was being flown at an excessive rate of descent immediately prior to the mid-air collision. Furthermore, in light of the eyewitness testimony herein, the Court believes that the collision occurred a sufficient distance below the clouds to have enabled the Allegheny flight crew to have seen and avoided the Piper Cherokee. The failure of such flight crew to use reasonable care in the operation of the DC–9 constituted negligence which was a proximate cause of the air crash. Therefore, although the United States, Forth Corporation, and Carey were also guilty of negligence which proximately contributed to the mid-air collision, Allegheny's own contributory negligence precludes it from any recovery for the loss of its aircraft.

**1344**

The Court of Appeals relied on the predominant federal interest in the proper functioning of the nation's airways to find that the doctrine of comparative negligence should be applied in the *indemnity* and *contribution* actions arising out of this air crash. However, the Court of Appeals made no such determination as to the present claims for *property damage*, although it had both cases before it on appeal at the same time and, had it chosen to do so, could have directed this Court to apply a comparative negligence approach herein as well. Additionally, the Federal Tort Claims Act, 28 U.S.C. § 1346(b), provides that the United States shall be liable to the claimant the same as a private person would "in accordance with the law of the place where the act or omission occurred." The common law of this state has long adhered to the principle that a party who has been guilty of negligence which proximately contributes to his own injury or damage may recover nothing for such injury or damage, even though another party may have been at fault to a greater extent. *Huey v. Milligan*, 242 Ind. 93, 175 N.E.2d 698 (1961); *Indianapolis Traction & Terminal Co. v. Croly*, 54 Ind.App. 566, 96 N.E. 973 (1911). The doctrine of comparative negligence is not generally followed in this state. *Birdsong v. ITT Continental Baking Co.*, Ind. App., 312 N.E.2d 104 (1974); *Hoesel v. Cain*, 222 Ind. 330, 53 N.E.2d 165 (1944). Therefore, in light of this Court having adopted the jury's determination as to the relative negligence of the parties herein, the Court hereby finds that Allegheny's own negligence which proximately contributed to the loss of its aircraft bars a recovery against any of the defendants, including the United States. If on appeal the Court of Appeals determines that a comparative negligence approach should be utilized in the property damage actions as well as in the indemnity action, this Court would attribute 36% of the total causal negligence herein to the United States of America and 22% of the total causal negligence to Allegheny. This would possibly permit the Court to render the appropriate judgment herein without the necessity of a retrial in light of the fact that there was no dispute that the amount of damages sustained by Allegheny through the loss of the DC–9–31 jet aircraft was $3,750,000.

However, as to the claim of GECC against the defendants herein, the evidence was undisputed, and counsel for the parties so stipulated, that GECC was the owner of one of the jet engines located on the aircraft. As such, it is a real party in interest in these proceedings and was entitled to bring this action for damages. See *Allegheny Airlines, Inc. v. United States, supra*, 504 F.2d at 111–12. The evidence was undisputed that such engine had a fair market value of $250,000 on September 9, 1969, and that it was totally destroyed in the mid-air collision. In light of the fact that there was no evidence of contributory negligence on the part of GECC and that the United States, Forth Corporation and Carey were each guilty of negligence which proximately contributed to the destruction of the jet engine, GECC is entitled to judgment against the defendants herein, jointly and severally, in the amount of $250,000. Interest on such amount is recoverable against defendants Forth Corporation and Lee LeMay, Administrator of the Estate of Robert W. Carey, deceased, from September 9, 1969, at the legal rate. Prejudgment interest is not recoverable on such amount against the United States. 28 U.S.C. § 2674.

The Court would also take this opportunity to explain its reasoning with respect to the judgment entered August 17, 1976, in the indemnity and contribution action, Cause No. IP 69–C–431. Counsel for each of the parties in such action proposed different methods of applying the jury's comparative negligence findings to the total amount of the settlement of all death claims arising out of the air crash. A total amount of $15,644,500 in settlement of such claims was stipulated by the parties herein to have been paid by Allegheny in the amount $10,332,666.67 and by the United States in the amount of $5,311,833.33. Forth Corporation and the Estate of Carey did not contribute toward the settlements.

Since all the parties agreed that the settlements were reasonable under the circumstances, the Court does not believe it need make individual and independent determinations whether such settlements were reasonable. See *Kohr v. Allegheny Airlines, Inc., supra,* 504 F.2d at 405. The Court believes that since the indemnity and contribution actions were brought by both Allegheny and the United States against Forth Corporation and the Estate of Carey, each of such claimants is entitled to recover from each of the defendants 21% of the amount each claimant contributed to the settlements. Since Forth Corporation and Carey were each found to have been guilty at the rate of 21% of the negligence contributing to the air crash, it seems reasonable that each of said defendants should pay to Allegheny and the United States an amount equal to 21% of the damage sustained by each of said plaintiffs. Therefore both Allegheny and the United States would recover 42% of their settlement payments. The Court would also point out that counsel for Forth Corporation agreed that as a matter of law it is liable for any judgment rendered against the Estate of Carey. See *Allegheny Airlines, Inc. v. United States, supra,* 504 F.2d at 114–15. Allegheny argues that the above described arrangement is not satisfactory because it ends up contributing significantly more than the 22% figure the jury assigned as its percentage of fault herein. The Court believes such disparity results not because of the erroneous application of indemnity principles, but because of the voluntary settlement agreed to herein between Allegheny and the United States in paying all pending death claims. Allegheny made no cross-claim against the United States for indemnity and contribution and the parties herein agreed that the jury's verdict would have no effect on such settlement. Therefore, the Court has ruled that each plaintiff in the indemnity action is entitled to recover the amounts set forth in the judgment entered August 17, 1976. Should the Court of Appeals disagree with the above analysis it may apply the jury's findings to the undisputed settlement amounts paid by Allegheny and the United States and arrive at the proper judgment in the indemnity and contribution action.

In regard to the motion of the United States seeking the Court to order that the property damage judgment awarded to GECC in Cause Number IP 70–C–609 be satisfied out of insurance proceeds paid into Court by defendant Forth Corporation, the Court does not believe such an order would be appropriate. Since GECC's judgment is against the United States as well as Forth Corporation and the Estate of Carey, and such defendants are liable for the judgment jointly and severally, this Court cannot dictate to GECC which defendant it must proceed against in seeking execution and satisfaction of such judgment. Therefore, the request of the United States in this respect is DENIED.

With respect to the entries of judgment in Cause Nos. IP 69–C–431 and IP 70–C–609 entered by the Court herein on August 17, 1976, the Court believes such judgments to be appropriate and the various motions filed by the parties to amend such entries are hereby DENIED.

Hereinbelow the Court enters its specific findings and conclusions as to the negligence of the United States and Allegheny in the property damage cause.

### FINDINGS OF FACT

1. This is a civil action for damages arising from the destruction of a Douglas DC–9–31 jet aircraft ( # N988VJ) owned and operated by Allegheny Airlines, Inc., (Allegheny) and one of the turbo-jet engines thereon ( # 657121D) owned by GECC Leasing Corporation (GECC) when said aircraft was involved in a mid-air collision with a Piper Cherokee PA–28–140B ( # N7374J) owned by the Forth Corporation and being piloted by Robert W. Carey. Such air crash occurred on September 9, 1969, in the air space over Fairland, Indiana.

2. Prior to the commencement of the action against the United States, administrative claims were filed by the plaintiffs with the Federal Aviation Administration (FAA). The claims were denied and within six months thereafter the plaintiffs com-

menced this action. Therefore, there has been compliance with the administrative claim provisions of the Federal Tort Claims Act. 28 U.S.C. § 2675.

3. The United States, through the FAA, owns, operates, maintains, and controls a number of radio communication, radar, electronic, and navigational facilities for providing air traffic control services. These facilities include the Cincinnati Tower, the Indianapolis Air Route Traffic Control Center, the Indianapolis Weir Cook Tower, which contains the Indianapolis arrival and departure radar services, and the Shelbyville VOR navigational aid.[4]

4. The Indianapolis Center (Center) provides air traffic control services for en route aircraft throughout a broad geographical area which includes all or part of the states of Indiana, Ohio, Kentucky, West Virginia, and Illinois and is physically located in a separate building on the northern boundary of the Weir Cook Airport.

5. The Indianapolis Tower (Tower) is physically located in the terminal building at Weir Cook Airport and provides air traffic control services for aircraft operating within the terminal control area, which generally includes all air space within a twenty-five mile radius of the Weir Cook Airport to an altitude of 6,000 feet above Mean Sea Level (MSL).[5]

6. Both the Center and Tower are air traffic control facilities which provide "air traffic control services" which are services "provided for the purpose of promoting the safe, orderly, and expeditious flow of air traffic." 14 C.F.R. § 1.1.

7. The above described Piper Cherokee was owned by the Forth Corporation, which operated from Brookside Airpark in McCordsville, Indiana and was in the business of renting aircraft and providing ground and flight instruction to student pilots. Robert W. Carey was a student pilot receiving flight instruction from Forth and had rented the aircraft in order to conduct a solo flight as part of his flight training.

8. At approximately 1900Z (3:00 p. m.) on September 9, 1969, Carey filed his flight plan[6] under Visual Flight Rules (VFR)[7] advising the FAA that he intended to fly the Piper Cherokee at an altitude of 3500 feet MSL from Brookside Airpark to Bakalar Air Force Base in Columbus, Indiana. Such flight was to be a solo "round-robin" flight to Bakalar and back to Brookside.

9. Brookside Airpark is located approximately fifteen to twenty miles northeast of Weir Cook Airport while Bakalar Air Force Base is approximately forth miles to the south of Brookside. Bakalar's elevation is 656 feet above sea level; Weir Cook Airport is 797 feet above sea level; and Brookside is 854 feet above sea level.

10. Carey took off from Brookside at approximately 1920Z (3:20 p. m.) heading south toward Bakalar. At the time of the mid-air collision Carey had flown approximately twenty miles and was in the vicinity of Fairland, Indiana.

11. On September 9, 1969, Allegheny was operating the above described DC–9 as Flight 853, a regularly scheduled passenger flight from Boston, Massachusetts to St. Louis, Missouri with intermediate stops at Baltimore, Cincinnati and Indianapolis.

---

4. A VOR navigational aid is a very high frequency omnidirectional radio range and is a type of ground radio navigational station which transmits a signal from which an aircraft equipped with proper receiving equipment tuned to the station's frequency can obtain course and heading directional information to or from that station.

5. Mean Sea Level is the base commonly used in measuring altitude. All altitudes are referred to in Mean Sea Level unless otherwise noted.

6. A flight plan is filed orally or in writing with Air Traffic Control providing specified information relating to the intended flight of the aircraft.

7. Visual Flight Rules are applicable when weather conditions allow an aircraft to be operated with visual reference to the ground. For purposes of this case the most important requirement for VFR flights is that aircraft operating under these conditions, such as the Piper Cherokee herein, must not be operated less than 500 feet below the base of the clouds. 14 C.F.R. § 91.105.

The crew of Allegheny Flight 853 consisted of Captain James M. Elrod, the pilot-in-command, who was at all times seated in the left seat and First Officer William C. Heckendorn, who was seated in the right seat. The crew was properly certificated for operation of the aircraft under all applicable Federal Aviation Regulations.

12. The flight of Allegheny 853 from its departure at Boston until arriving at Cincinnati was routine. At Cincinnati the aircraft was refueled and departed at 1916Z (3:16 p. m.). The FAA had approved Flight 853's Instrument Flight Rule (IFR)[8] flight plan which provided for flight at an altitude of 10,000 feet MSL along Victor Airway 97[9] to the Shelbyville VOR and then direct to Weir Cook Airport.

13. After take-off, the FAA's Cincinnati Departure Radar Control established radio and radar contact with Allegheny Flight 853 and cleared the flight to climb and maintain 6,000 feet. Shortly thereafter, Cincinnati radar further cleared Flight 853 to climb to and maintain 10,000 feet and to contact the Indianapolis Center.

14. At 1922:37Z (3:22:37 p. m.) Allegheny 853 contacted the Center's Indianapolis Low Altitude Sector and advised the controller that the plane was at 10,000 feet. The Center controller asked Flight 853 to "squawk"[10] a particular code on its transponder which allowed the Center controller to positively identify the aircraft on his radar scope. After advising Flight 853 that radar contact had been accomplished, the Center controller advised the crew to "cross Shelbyville at and maintain 6000" feet, which advisory was acknowledged by the crew. Shortly thereafter the Center controller instructed the crew to contact Indianapolis Approach Control, located in the IFR Room of the Tower at Weir Cook Air-

port, on a certain radio frequency. This instruction was acknowledged by Flight 853 and, thereafter, the Center controller had no further communications with the flight.

15. Control of Flight 853 was transferred from the Center to the IFR Room of the Tower by means of the radar handoff exchange between the Center controller and the Arrival Radar controller between 1925:58Z (3:25:58 p. m.) and 1926:38Z (3:26:38 p. m.).

16. From the time of such handoff until the mid-air collision, the Indianapolis Tower, and in particular the Arrival Radar controller in charge of such flight, was responsible for providing Allegheny Flight 853 with the necessary air traffic control services.

17. On September 9, 1969, there were five operating positions in the IFR Room of the Indianapolis Tower. Two of such positions were known as Arrival Radar (AR) positions which provided air traffic control services to aircraft approaching to land at Indianapolis. At approximately 1900Z (3:00 p. m.) the two AR positions had been combined and at all relevant times thereafter such positions were being operated by air traffic controller Merrill T. McCammack.

18. Such AR controller had responsibility for all traffic making approaches to Weir Cook Airport and his position was equipped with two-way radio equipment which permitted him to communicate directly with any airplane in flight which was tuned to his radio frequency. In addition, the AR positions were equipped with radar scopes which permitted the controller to observe the location, heading, and geographical position of aircraft from the site of the radar antenna, which was located on the airport grounds. The radar, however, did not have

---

8. Instrument Flight Rules govern the operation of planes having the required IFR equipment and are applicable when weather conditions are below the minimum requirements for VFR flights. IFR flights are flown along airways at altitudes assigned by air traffic controllers and are more heavily regulated by such controllers. Such flights depend on radar services by controllers since visual contact with the ground

and other traffic is generally limited under IFR conditions.

9. Victor Airway 97 is a federally established air corridor between two navigational facilities.

10. For a more complete description of this procedure see Finding of Fact No. 21 set forth hereinafter.

the capability of showing the height of the aircraft above the ground.

19. Although the AR controller's radar had the capability of displaying targets within a fifty mile range, he had set the display for a thirty mile range. The radar antenna rotated at a rate of fifteen complete revolutions per minute, thus providing the controller with a completely updated radar picture every four seconds.

20. The foregoing radar display also had a feature which allowed it to display only moving targets. The Moving Target Indicator (MTI) used electronic circuitry to cancel out the signals received from stationary targets. This MTI feature, by permitting the controller to eliminate so-called "ground clutter" which generally occurred close to the antenna site, made it easier for him to see and control aircraft moving through his radar area. At all relevant times the MTI gate was set at 20 to 25 miles.

21. In addition to the basic or "primary" radar, the radar equipment used by the AR controller had a "secondary" or transponder beacon capability. Secondary surveillance radar consists of a ground based interrogator and an airborne transponder aboard an aircraft. In response to interrogation from the FAA's ground equipment the airborne transponder will transmit a radio signal which appears on the radar display and enhances the primary radar target by appearing as a bright double slash. If the "ident" or "squawk" feature is used the space between the two slashes will fill, thus presenting a brightened, wider radar target. All air carrier aircraft must be equipped with transponder equipment and controllers will frequently rely on the secondary or beacon target for providing air traffic control services. Where an aircraft has the requisite transponder and it is tuned to the particular code selected by the controller, the secondary target will appear as a brighter and more pronounced target on the radar display. Allegheny 853 was equipped with a transponder and it was tuned to the appropriate code. The Piper Cherokee was not equipped with a transponder.

22. At all times relevant herein, the radar equipment used by the AR controller was functioning properly and capable of displaying both primary and secondary targets. All parties have stipulated to this fact, which is supported by evidence showing that both before and after the aircrash primary targets were being displayed on the controller's radar scope. Similarly, other controllers working in the IFR Room at the time of the aircrash testified that the radar was working properly at the time.

23. At 1927:02Z (3:27:02 p. m.) Flight 853 first contacted the Tower and advised the AR controller that it was "descending to 6000 feet" in accordance with its previous communication with the Center controller. At that time Flight 853 was proceeding westbound on Victor Airway 97 and was approximately thirty-two miles southeast of Weir Cook Airport.

24. The AR controller thereafter acknowledged such communication and asked the flight to identify itself by means of its transponder. He further advised the flight to assume a heading of 280°, to prepare for a visual approach on Weir Cook runway 31 left, to descend at an altitude of 2500 feet, and to report when reaching such altitude. Flight 853 acknowledged the 280° heading and the clearance to 2500 feet, and it indicated that it would report when reaching such altitude. The last known or recorded transmission from Flight 853 was this acknowledgment at 1927:29Z (3:27:29 p. m.).

25. The mid-air collision occurred at 1429:13Z (3:29:13 p. m.). This time is determined by correlating the transmissions which appear on the air traffic control recordings and transcript with the sounds of impact heard on the cockpit voice recorder [11] aboard the Allegheny jet. The radar targets of the two aircraft must have disappeared from the radar scope within seconds of the collision.

11. The cockpit voice recorder is a device aboard the Allegheny aircraft which recorded all radio transmissions and other communica-

tions and sounds heard in the cockpit. The recording from Flight 853 and a transcript thereof was admitted into evidence.

26. At the time of the collision the Piper Cherokee was on a magnetic heading of approximately 174° flying in level flight at an altitude between 3600 and 3639 feet. At that time the DC–9 was on a magnetic heading of approximately 280° and was descending to 2500 feet in accordance with the clearance issued to it by the AR controller.

27. The two aircraft collided at an angle of approximately 102° to 110°, with the Piper Cherokee coming from the right of the DC–9. The front upper right side of the verticle tail of the DC–9 struck the front left side of the Piper Cherokee just forward of the place where the wing and fuselage connect. The tail cut into the cockpit of the Piper Cherokee before separating from the DC–9. Both planes crashed to the ground and were totally destroyed.

28. It is the duty of all pilots to operate their aircraft in a reasonable and prudent manner and, as weather conditions permit, to exercise and maintain reasonable vigilance for other aircraft. 14 C.F.R. § 91.67.

29. The Court finds that the mid-air collision occurred at an altitude sufficiently below the clouds to have enabled the Allegheny flight crew to have seen and avoided colliding with the Piper Cherokee had such flight crew been exercising a reasonable lookout for other aircraft.

30. The Allegheny flight crew was operating the DC–9 at an excessive rate of descent just prior to the air crash.[12]

31. Although the Allegheny flight crew had a right to assume that the Tower's air traffic controllers and the pilots of other aircraft, such as the Piper Cherokee, would use reasonable care in the performance of their respective duties, such does not relieve the flight crew of a similar standard. As is the case with all pilots of aircraft, the Allegheny flight crew was primarily responsible for the operation and control of Flight 853. 14 C.F.R. § 121.533; *Sawyer v. United States*, 297 F.Supp. 324, 331–32 (E.D.N.Y. 1969), *aff'd.*, 436 F.2d 640 (2nd Cir. 1970).

32. At some time after his last communication with Flight 853 at 1927:29Z (3:27:29 p. m.), the AR controller looked away from his radar scope. He did not see a target for Flight 853 at any time after he looked away, nor did he see the mid-air collision on his scope. Although the AR controller testified that at no time did he ever see a radar target for the Piper Cherokee on his scope, the Court finds that the target for such Piper Cherokee should have appeared and did appear on his scope sufficiently prior to the time of the collision to enable the controller to provide the necessary radar services to Flight 853.[13] The Court believes there was no justification for such target not to have been seen by the controller.

33. The AR controller did not attempt to contact Flight 853 until 1930:52Z (3:30:52 p. m.), approximately one minute and thirty-eight seconds after the mid-air collision. Three minutes and twenty-three seconds elapsed between the time of the last message from Flight 853 until the controller again tried to contact the DC–9. During this time the controller was neither commu-

---

12. The evidence established that the DC–9 was descending at a rate slightly in excess of 2300 feet per minute just prior to the mid-air collision. This rate is excessive under the circumstances since Allegheny's own flight manuals recommend that during the last 1000 feet prior to reaching an assigned altitude the aircraft's rate of descent should not exceed 500 feet per minute. Thus, it would seem that if the aircraft was descending at a rate of 2300 feet per minute just prior to the time it was to have reached 3500 feet MSL, it would not have been possible for the aircraft to have slowed its descent sufficiently to be able to descend to its assigned altitude of 2500 feet MSL at a rate of 500 feet per minute. The Court does not con-

sider it mere speculation to believe had the DC–9 been operated at a more reasonable rate of descent, the flight crew may have been able to avoid the Piper Cherokee once such aircraft was finally observed.

13. The evidence was that the radar scope displayed targets of aircraft in the vicinity of Brookside down to an altitude as low as 1700 MSL or 848 feet above the ground. Since Carey took off at approximately 1920Z (3:20 p. m.) he undoubtedly had climbed to the 1700 feet MSL minimum reception altitude by 1923Z (3:23 p. m.). Therefore, the Piper Cherokee should have been within radar coverage for at least six minutes prior to the mid-air collision.

nicating with nor controlling any other planes.

34. The Court finds that the IFR Room was not busy during the time Flight 853 was in contact with the Tower. During the entire time the flight was under the AR controller's jurisdiction, such controller's primary responsibility was to control Flight 853 and provide radar separation therefor. The workload of the other controllers in the Tower at the time was also light, with the result that no extraordinary distractions existed which might have impeded or prevented observation of the Piper Cherokee radar target and its convergence with Flight 853.

35. On September 9, 1969, there were in effect two FAA manuals applicable to and which governed the duties of the controllers in the Indianapolis Tower. They were the Facility Operations Manual (ATP7230.1) and the Terminal Air Traffic Control Manual (ATP7110.8). These manuals specified the air traffic control procedures governing the duties of controllers and the controllers admitted that they were required to be familiar with and comply with these manuals.

36. The Tower controllers' duties were further set forth in the Civil Service Classification Manual (GS-2152) applicable to air traffic controllers. They were also required to comply with the rules and orders issued by the Indianapolis Tower and the Letter of Agreement between the Indianapolis Tower and the Indianapolis Center.

37. From the time the Indianapolis Tower assumed control over Flight 853 by accepting the radar handoff from the Center, it was required to "give first priority to separation of (the) aircraft" as required by Chapter 2, § 1, paragraph 25 of the Terminal Control Manual. Clerical duties were subordinated to the requirement of providing separation of air traffic.

38. Since the handling and control of Flight 853 involved a radar operation, the AR controller was required to follow the plane at all times and to provide it with the required radar services, which included radar separation, radar navigational guidance, radar monitoring, radar surveillance and radar tracking, as those terms are defined in Chapter 1, § 3, paragraph 20 of the Terminal Control Manual. He was also required to issue safety advisories and traffic information to Flight 853 which included the distance, type, altitude, direction and azimuth from Flight 853 of any other airplanes operating in its vicinity. He was also required to provide "merging target" service to Allegheny 853 which meant that he had to:

"Issue radar traffic information to the aircraft when its target is likely to merge with another aircraft target unless the traffic is known to be separated by more than the minimum approved vertical separation." [14]

39. The above described duties were breached by the United States, by and through its agents employed by the FAA. At no time did the Indianapolis Tower issue traffic information or safety advisories to Flight 853. Such flight was neither provided with radar separation from the Piper Cherokee nor was it provided with the mandatory merging target warnings.

40. On September 9, 1969, the fair market value of the DC-9 aircraft (excluding the GECC engine attached thereto) was $3,750,000. On such date the fair market value of the above described jet engine owned by GECC was $250,000.

CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties herein and over the subject matter of this litigation.

2. The United States, through its agents and employees of the FAA, negligently breached its duty to provide the necessary radar services to Allegheny Flight 853 prior to the mid-air collision herein.

3. The Allegheny flight crew's failure to exercise reasonable care in the operation of

14. Chap. 6, § 17, paragraph 816 of the Traffic Control Manual.

the DC–9 constituted negligence which was a proximate cause of the mid-air collision.

4. Were it not for the negligence of Allegheny which proximately contributed to the air crash, the law is clear that the negligence on the part of the United States would render it liable under the Federal Tort Claims Act for the damages sustained by Allegheny. *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227, 236 (2nd Cir. 1967), *cert. denied*, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1968).

5. As a result of the negligent conduct of Allegheny which proximately contributed to its own damage, Allegheny is not entitled to recover against the United States on its complaint herein.

6. Plaintiff GECC was not guilty of any negligence which proximately contributed to the aircrash and the resulting loss of its jet engine.

7. Therefore, GECC is entitled to judgment against the United States under the Federal Tort Claims Act in the amount of $250,000. Prejudgment interest is not recoverable on such amount. 28 U.S.C. § 2674.

8. Any finding of fact which is more appropriate as a conclusion of law, and vice versa, should be treated as such.

9. Any findings of fact or conclusions of law which are found in the Court's Memorandum Entry above may be treated as such as if they were fully set forth herein.

JUDGMENT HAS BEEN ENTERED IN ACCORDANCE WITH THE ABOVE.