**William HIMMLER et al.**

v.

**UNITED STATES of America.**

**Civ. A. No. 75–2136.**

United States District Court,
E. D. Pennsylvania.

Aug. 14, 1979.

William C. Wickkiser, James B. Martin, Richard F. Stevens, Allentown, Pa., for plaintiffs.

Andrew J. Dilk, Jr., Trial Atty., U. S. Dept. of Transp., Federal Aviation Administration, Washington, D. C., William J. McGettigan, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

TROUTMAN, District Judge.

I

INTRODUCTION, PARTIES, JURISDICTION AND BACKGROUND

This case arises out of the crash of an airplane into the home occupied by the plaintiffs in the early morning hours of August 23, 1974, injuring and killing various members of the plaintiffs' family. It is brought pursuant to the terms and provisions of the Federal Tort Claims Act, Title 28 U.S.C. §§ 1346(b), 1402(b) and 2671 *et seq.* All jurisdictional and notice requirements have been met. Section 1346(b) states in applicable part that the United States shall be liable for personal injury, death or property damage caused by the negligent or wrongful act or omission of a Government employee in accordance with the law of the place where the act or omission occurred. The law of Pennsylvania, therefore, governs this action. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

■ The purpose of the Federal Aviation Act of 1958 is to promote aviation safety. Such purpose extends to the safety of persons on the ground. Federal Aviation Act of 1958, §§ 103, 307(c), 49 U.S.C. §§ 1303, 1348(c).

Federal Aviation Act 49 U.S.C. § 1348(c):

"The administrator is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection and identification of aircraft, *for the protection of persons and property on the ground,* and for the efficient utilization of the navigable airspace, including rules of safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects." (Emphasis added)

Case law likewise establishes a duty to persons on the ground. *Starr v. United States of America,* 393 F.Supp. 1359 (N.D.Texas 1975).

Plaintiffs assert a claim against the United States contending that the Air Traffic Controller at the Allentown-Bethlehem-Easton Airport, an employee of the United States, acted negligently. His negligent acts allegedly occurred after he had assumed control of a VFR (visual flight rules) pilot who was trapped in IFR (instrument flight rules) weather conditions. Plaintiffs contend that the negligence of the controller was a substantial factor in causing the

subsequent crash. The defendant contends otherwise, asserting, *inter alia*, that the crash was the result of spatial disorientation suffered by the pilot unrelated to the conduct of the controller and that the crash was solely the result of the negligence of the pilot.

■ The burden of proving negligence on the part of the controller and that such negligence was a substantial factor in causing plaintiffs' harm is upon the plaintiffs. Conversely, the burden of proving that the sole cause of the accident was the act or negligence of the pilot is upon the defendant.

On August 23, 1974, a single engine Cessna 172H, with FAA registration mark N8191L (91L) took off from the Queen City Airport, Allentown, Pennsylvania. The plane departed Queen City at approximately 2:30 A.M. It was piloted by Amos Rothschild and occupied by a passenger, Darold Hemphill, both of whom were killed in the crash. Mr. Rothschild held a private single engine land pilot's license. He was not an instrument rated pilot; however, he had received limited, but the required, instructions in instrument flying as part of his training for his private pilot's license. The precise weather existing at Queen City at the time of 91L's take-off is unknown except to the extent that one might assume that the weather at Queen City, located 5.6 miles from Allentown-Bethlehem-Easton Airport was similar. The parties have stipulated that at 2:47 A.M., the weather at Allentown-Bethlehem-Easton Airport was 400 foot ceiling; visibility 2½ miles; with light rain showers and fog; temperature 72 °; dew point 70 °; wind 120 ° at 10 knots; altimeter setting 30.14. A light rain began falling at Allentown-Bethlehem-Easton Airport at 2:45 A.M.

The Allentown-Bethlehem-Easton Airport (ABE) is located northeast of the City of Allentown. ABE has two runways, each of which can be used from two directions. The runways are numbered 6 and 24 for the northeast-southwest traffic, and 13 and 31 for the southeast-northwest traffic. The runway in use on the morning in question was runway 6. That runway has a magnetic compass heading of 60 °. It runs in a generally northeast direction. Runway 6 is equipped with facilities to permit instrument landing system (ILS) approaches. An ASR7 radar system was in use at the ABE Airport on the morning in question. The final approach course for runway 6 starts at the outer marker. The outer marker is 6.1 miles from the threshold of runway 6. The middle marker is .6 of a mile from the threshold of runway 6. The Wilkes-Barre Airport, also a factor in this case, is located fifty statute miles or forty-three nautical miles from ABE. It also has an ASR7 radar system, a control tower, controllers and lights.

On August 23, 1974, there were five control positions at ABE to be operated by controllers. Generally, on the day and middle shifts, these positions were staffed by five controllers and a supervisor. However, on the midnight to 8:00 A.M. shift, when this crash occurred, there was only one controller on duty who operated all positions, including that of supervisor. The controller on duty on the morning in question was Karl Gasker. The radar system at ABE was installed in March, 1974. While Gasker was qualified in departure radar services, having received his certification in that service on May 21, 1974, he had not been qualified to handle arriving airplanes on radar. He was not qualified for that service until October 31, 1974, subsequent to the date of the accident. Thus, on August 23, 1974, the radar system at ABE was not effective to monitor or control radar surveillance approaches and the controller was *not qualified to perform same.* In fact, the record suggests that surveillance approaches are still not published as available at ABE.

For purposes of calculation, the cruising speed of 91L was agreed to be 100 knots, or 1.66 nautical miles per minute. It had an effective altitude range of up to 10,000 feet, and with almost full fuel tanks, had at least three hours of flying time available on August 23, 1974. The plane had no ILS landing instrumentation on board.

Two airplanes, in addition to 91L, were in the air in the vicinity of ABE on the morning in question. One was an airplane known as 87L. This was a twin engine Navajo proceeding on a flight from Rochester, New York, through the Wilkes-Barre area to ABE. 87L was leased to the Kodak Corporation on the night in question. The flight path of 87L took it on a direct route from the Wilkes-Barre area to the East Texas VOR. East Texas is north of the ABE outer marker. 87L was cleared from East Texas to the outer marker, and from there for a straight ILS landing on runway 6 at ABE. The other plane was owned by Monmouth Airlines and is referred to as Monmouth 508 (508M). It was a twin-engine Beechcraft 99, weighing about 10,000 pounds. For purposes of calculation, its cruising speed was 210 knots, and its holding pattern speed was 140 knots, or 2.33 nautical miles per minute. It was on an instrument flight plan from Newark, New Jersey, to Allentown, Pennsylvania. The captain and pilot of 508M was Frederick Cruwell. The co-pilot was John Hoffman. 508M was delivering mail for the United States Government. It carried no passengers. The flight path of 508M took it over Solberg, a VOR 32 miles east of ABE and over Spring Intersection, 18.1 miles east of the ABE outer marker. Spring Intersection is a point where two airways intersect. Neither 87L or 508M were receiving radar services from the controller, Gasker, on the morning in question. Both, however, were on instrument flight plans, and were piloted by instrument-rated pilots.

There has been introduced as evidence in this case, as plaintiffs' Exhibit # 9 a typed transcript of the radio transmissions between ABE tower, 87L, 508M, and 91L on the morning in question covering the time period from 0239:28 A.M. to 0321:04 A.M. which was relied upon by the expert witnesses of both parties.

## II

## PLAINTIFFS' THEORIES

Plaintiffs' theories of liability may, for convenience, be summarized as follows: First, plaintiffs contend that because of the actions and inactions of the controller, Karl Gasker, the pilot, Amos Rothschild, suffered spatial disorientation and crashed as a result thereof. Second, and closely aligned with the theory of spatial disorientation, is plaintiffs' contention that the controller had a duty to vector 91L to Wilkes-Barre, rather than to attempt a landing at Allentown because of the poor weather conditions existing there. Plaintiffs argue that the controller was negligent in failing to warn the pilot of the weather conditions at Allentown, and in failing to instruct the pilot to fly to Wilkes-Barre where much better weather conditions existed. In this respect, plaintiffs contend that the controller lured the pilot of 91L into attempting a landing at ABE and in the process, induced spatial disorientation. Third, plaintiffs argue, in the alternative, that a near-collision ("buzzing") occurred between 91L and 508M, and that this caused the pilot to lose control of the plane and to crash. In the latter case, plaintiffs contend that the controller was negligent in failing to provide for proper separation between the two aircraft.

## III

## SPATIAL DISORIENTATION

The defendant denies improper separation of aircraft, denies a "buzzing", but admits that the pilot of 91L, Amos Rothschild, suffered spatial disorientation. Whereas the plaintiffs contend that the spatial disorientation suffered by Rothschild was induced by the actions and inactions of the controller, the defendant contends that spatial disorientation was the mere result of Rothschild's flying into IFR weather conditions without the requisite instrument rating and capabilities.

Spatial disorientation, analogous to vertigo or dizziness in layman's terms, means in simple language that a pilot does not know which end is up. A pilot suffering from spatial disorientation will have false and misleading sensations as to what the aircraft under his control is actually doing. For example, a spatially disorientated pilot

may have the sensation of climbing, when in fact the aircraft is descending, or vice versa, and will react accordingly in operating the controls of the aircraft. Pilots with instrument flight training are less likely to suffer spatial disorientation than pilots only qualified to fly under visual flight rules and if they do suffer the phenomenon are specially trained to rely on the instruments rather than their senses. All pilots, whether instrument rated or not, receive limited training in flying under instrument conditions. Rothschild received 5.5 hours of instrument flight training prior to receiving his private pilot's license. What further training and experience he may have had, if any, subsequent to his being licensed is unknown.

Spatial disorientation is a well-known phenomenon to people in aviation. Pilots are taught about the possibility of becoming spatially disoriented and how to combat it. Likewise, controllers are trained with respect to spatial disorientation, and how to cope with it in dealing with a pilot lost in instrument weather conditions. One of the ways of combatting spatial disorientation is for a pilot to concentrate on the plane's instruments. Avoiding sudden movements of the head is particularly important. Repeatedly looking out of the plane's windows in an attempt to see the ground, or, as in this case, in an attempt to see an airport, is an extremely dangerous procedure when flying in IFR conditions and is likely to induce spatial disorientation. A controller trained with respect to the dangers of spatial disorientation should advise a non-instrument-rated pilot to keep his eyes on his instruments. A non-instrument-rated pilot should watch his altitude and attitude indicators and should not be instructed to do otherwise unless there is good reason to believe that in doing otherwise, such as looking out the window, what he sees will serve to orient him rather than disorient him. Importantly, in this case, the controller should have talked to the pilot frequently and with reasonable continuity, reassuring him, advising him to observe his instruments rather than communicating on an intermittent basis; and, by no means,

should the pilot have been left alone in complete radio silence for protracted periods within the limited time frame involved.

On the morning in question, 91L had been flying in IFR conditions from within a few minutes of his take-off from Queen City at or about 2:30 A.M. During the almost twenty-five-minute period between take-off at 2:30 A.M. and 0254:57, 91L's first contact with ABE tower, the pilot had experienced no recognizable difficulty in flying the aircraft, other than the fact that he was lost in instrument-weather conditions. Significantly, after contacting ABE tower at 0254:57, and seeking to follow and respond to the controller's intermittent and sometimes confusing instructions and inquiries, 91L crashed within approximately eight minutes. Interestingly, the defendant's expert witnesses have stated that spatial disorientation will occur within twenty seconds to eight minutes after a non-instrument-rated pilot has flown into IFR weather conditions. The question then becomes, what caused the pilot of 91L to become spatially disoriented on the morning in question?

Controllers are trained to frequently communicate with a pilot lost in IFR weather conditions. From 0254:57 until the time of the crash, seven minutes and thirty seconds elapsed. A review of the transcript shows that of the total elapsed time, the controller spent only two minutes, seventeen seconds talking to the pilot of 91L. The pilot's responses took a total of fifty-six seconds. Thus, three minutes, thirteen seconds, less than half of the time of the emergency, was spent communicating with the lost pilot of 91L. Moreover, during the total elapsed time, there were three minutes, thirty-six seconds of radio silence. Controllers are taught not to allow long periods of time to elapse without talking to a lost pilot. The controller's failure in these two fundamental areas was a breach of his duties and a violation of the provisions of the Air Traffic Control Manual. The controller's failure to communicate with the pilot of 91L on a more frequent basis and with greater continuity during the course of this emergency

obviously contributed to the pilot's becoming spatially disoriented.

While the failure to communicate with greater continuity was an act of omission on the part of the controller, his acts of commission likewise contributed to spatial disorientation of the pilot. At 0255:36 ABE gave a clearance to 87L to land. This was the second clearance which 87L had received, the first having occurred at 0253:42 after 87L had passed the outer marker inbound. By 0255:36, 87L was already well into his final landing approach and no second clearance was necessary. Moreover, this second clearance to 87L followed directly after a response by the tower to 91L. At 0255:34, 91L responded to a query by the controller, "I'm flying about two four". Two seconds later the tower responded, "Okay, uh, 87Lima's cleared to land, runway six". 91L responded at 0255:42, "Yeah, but I don't know where you are". Obviously, and all witnesses at trial seem to concur, 91L mistook the clearance given to 87L to be a clearance to 91L to land. Even the controller, Gasker, testified at trial that 91L had misinterpreted 87L's clearance to land as his own. However, Gasker never attempted to correct 91L's misinterpretation. This was clearly a major contribution to the pilot's subsequent confusion and ultimate disorientation.

Gasker, on the morning in question, knew what the weather conditions at ABE were. He knew that the visibility was, in his words, "up and down quite a bit between 2½ to 3 miles", and that the ceiling was 400 feet overcast. Despite his knowledge of the weather conditions, the controller, at 0257:42, made the following transmission to 91L:

"Okay, 91L, I have you in radar contact, and you are only one mile from the Allentown Airport, it's off to your right side, I'll turn the approach lights up as high as they go, uh, let me know if you have them in sight off to your right side."

Predictably, 91L, after having been told that the airport was off to his right, made a right turn. This is confirmed in the transcript at 0258:18. It is also reasonable to believe that the pilot looked for the airport. After all, the controller had instructed Rothschild to let him know if he had the approach lights in sight. How the controller, with an overcast of 400 feet and 91L at an altitude of 2,000 feet, ever expected the pilot to be able to see the approach lights is unexplained. If the defendant's theory with respect to spatial disorientation occurring within a time frame of 20 seconds to 8 minutes is correct[1], it should have been clear then and is certainly clear now that an inexperienced, non-instrument-rated pilot, given such instruction, was going to become spatially disoriented. Rather than warning the pilot about the possibility of disorientation, and rather than instructing the pilot to keep a close and constant vigil on his instruments, Gasker in effect instructed the pilot to remove his gaze from the instruments and to begin looking for the airport which, under the existing weather conditions, was impossible for the pilot to locate at his elevation in the prevailing weather conditions.

Further, the controller made more transmissions to the pilot which could have done nothing but induce him to continue to look for the airport. At 0258:20, ABE said, "Okay, very good, you're going to go right over the Allentown Airport, you're almost over at this time, I'll turn, uh, all the airport lights on, uh, as high as they go for you". At 0258:38, ABE said, "And, nine one lima, can you see the ground at all?" The result of these transmissions is that the controller had induced the pilot of 91L to alter his course and look for the airport and/or its lights for a period of about one minute. Rather, the pilot should have been instructed to keep an eye on his instruments, and to maintain straight and level flight. The controller, in the three above-quoted transmissions, violated the provisions of the Air Traffic Control Manual, and ignored his training with respect to dealing with non-instrument-rated pilots

---

1. The defendant's evidence as to the time frame within which spatial disorientation occurs has substantially contributed to the success of plaintiffs' case.

lost in IFR weather conditions. Interestingly, Gasker testified that the instructions aforementioned were exactly the kind of instructions which would be given to a lost VFR pilot in VFR, not IFR, conditions. Such a pilot would, of course, be expected to look out of his plane to find the airport visually. However, a pilot in VFR conditions is not likely to become spatially disoriented.

Importantly, the defendant produced a witness, Charles Wotring, for the purpose of demonstrating the Barony Chair to demonstrate the effects of spatial disorientation. The in-Court demonstration of the Barony Chair illustrated that the subject spinning in the chair had no problem of disorientation until he was instructed to put his head down in the area of his right shoulder, simulating a pilot looking out of the window for an airport or its lights. When he did that, he evidenced symptoms of disorientation. The chair demonstrated that each time the pilot of 91L, following the controller's instructions, looked out and down in a futile effort to find the airport or its lights, he was increasing the potentiality of suffering spatial disorientation.[2] The only logical inference which may be drawn from the transmissions at 0257:42, 0258:20 and 0258:38 is that the controller, by those transmissions, induced or contributed to spatial disorientation of the pilot which ultimately led to the crash.

Unfortunately, the spatially disorienting transmissions did not cease. At 0258:41, 91L had reported his altitude at 2300 feet. At 0259:22, Gasker directed 91L to "* * * maintain two thousand five hundred on the altitude. * * *" That instruction was closely followed at 0259:55 with an instruction to "* * * turn to the left to a heading of two seven zero * * *". Thus, the controller instructed the pilot to climb and to make a turn at the same time. Since 91L's last reported heading, at 0259:37 was "I'm heading six now" meaning 60 °, the controller's instruction

required a turn of 150 °. This was a very severe and constant turn. Controllers are taught that the proper method for turning a VFR pilot lost in instrument conditions is to give 30 ° turns and to instruct the pilot to make these gradually, and to make certain, after having made each turn, that the plane is stabilized. Thus, what the controller should have done in this situation, if he wanted a heading change from 60 ° to 270 °, would have been to give a series of lesser turns. Such procedure is not something with which controllers are unfamiliar. In fact, Section 1851, Radar Assistance Techniques of the ATCM, instructs controllers as follows:

> "Use the following techniques to the extent possible when you provide radar assistance to a pilot not qualified to operate in IFR conditions: . . . (d.) Avoid requiring a climb or descent while in a turn if in IFR conditions . . . (e.) Avoid abrupt maneuvers."

Accordingly, we conclude that the action of the controller in ordering a 150 ° turn while in a climb, was a violation of the Air Traffic Control Manual and a breach of the standard of due care expected of a controller acting in an emergency situation. Further, we conclude that the controller, in having encouraged the pilot to look for the airport, under the prevailing and known conditions, created a situation where the pilot of 91L was a certain candidate for spatial disorientation (likely to occur within twenty seconds to eight minutes, says the defendant).

Following the instruction to turn given at 0259:55, the controller did not communicate with 91L again until 0301:31. This absence of communication occurred without any notice to 91L or warning from the controller. Thus, 91L was climbing and in a difficult turn of 150°, and was without any communication from the controller. The Court has listened to the tape recording made of the transmissions from ABE tower to 91L. The Court is impressed by the lack of communi-

---

**2.** Here again, evidence produced by the defendant has substantially contributed to the plaintiffs' case.

cation between 0259:55 and 0301:31. When one listens to that silence, one can visualize what must have been occurring in the cockpit of 91L during that time period. One can picture the pilot in the cockpit, lost in the clouds, becoming more frightened by the moment while waiting for the controller to further assure and advise him. Suddenly his only link to the world outside that cloud, his radio, was silent. No help was being received from the controller upon whom he was depending. Although the controller was otherwise occupied, it is apparent that the silence of a minute and a half was a violation of good operating practice and procedure. If necessary, Gasker could have utilized the pilot of 508M to obtain the Wilkes-Barre weather or to talk to 91L during the time that he was off the radio. We conclude that the failure to utilize the pilot of 508M, and the failure of the controller to keep in more constant communication with 91L was likewise a substantial contributing factor in the cause of the pilot's spatial disorientation and the resulting accident.

Having left the pilot alone for over a minute and a half, the controller, at 0301:31, finally came back on the radio and gave 91L the weather at Wilkes-Barre. Following the weather report, he told 91L, " * * * now I can attempt to vector you to the Allentown Airport, or if you like, *you* can navigate up there in VFR conditions, it's your choice sir." No offer was made to *vector* 91L to Wilkes-Barre. Rather it was the pilot's exclusive responsibility to navigate to Wilkes-Barre on his own. Thus, the controller placed the pilot 91L in the position of having to make a crucial determination after having been left alone for over a minute and a half, and after having made a turn of 150 ° while climbing in altitude. Moreover, the controller at no time had given 91L the weather conditions at Allentown. Thus, the pilot was in the position of making this crucial decision in a vacuum. He did not know what the weather conditions were in terms of ceiling or visibility and it was not suggested that he could be vectored elsewhere. He was not given the information necessary and essential to the

informed decision to be made by the pilot in command.

Controllers are taught that in an emergency situation they have to take charge. They are supposed to take command of the situation. Here, the controller did not take command. He gave to the pilot a choice between Wilkes-Barre and Allentown. When 91L responded, "let me try Allentown one time", the controller, instead of warning him against Allentown or at least giving him necessary weather information, confirmed his choice and said, "alright sir, fine". There is no provision in the ATCM expressly permitting a controller to give such an option to a VFR pilot flying under instrument weather conditions. The ATCM requires controllers to vector such an airplane to a location where VFR conditions exist. Under the facts of this case, VFR conditions existed at the Wilkes-Barre Airport. They did not exist at ABE Airport. However, instead of offering 91L a vector to Wilkes-Barre, the controller said, "I can attempt to vector you to the Allentown Airport". Such a vector was futile under the existing weather conditions and should never have been suggested by the controller absent, at least, a viable alternative, including vectoring to Wilkes-Barre. The failure on the part of the controller to suggest the possibility of flying to Wilkes-Barre and to offer him a vector for that purpose was a clear violation of the ATCM, good operating practices, and the standard of care owed by a controller to a pilot under the circumstances existing that morning.

Shortly after receiving the Wilkes-Barre weather and the option from the controller, 91L reported, at 0302:08, that another airplane had just buzzed him. Since Gasker contends that such a buzzing was impossible because there were no other aircraft observed within fifteen miles of 91L at the time, it is clear that the communication from 91L with respect to a buzzing should have been an obvious indication to the controller that the pilot was disoriented. However, instead of taking immediate action by way of calling the pilot's attention, first, to his instruments to insure that the pilot

would at least attempt to stabilize the aircraft and maintain a safe altitude, and, second, to the fact that he was not buzzed, the controller missed the first transmission and continued to question the pilot about the buzzing for approximately twenty seconds. As the defendant contends, if 91L had not been buzzed, then he must have drifted down from his altitude of 2500 feet to some lesser altitude where he observed a ground light which misled him into believing that he had been buzzed by another airplane. It is recognized that light can cause a type of spatial disorientation. This phenomenon is recognized in Air Traffic literature and is known as flicker vertigo. Gasker should have recognized this as a possibility and should have taken immediate corrective action. Clearly, Gasker had the last clear chance to avoid this accident and failed.

■ Thus, we find and conclude that the inactions of the controller in failing to communicate to the pilot on a frequent basis, in failing to draw the pilot's attention to his instruments so that he could maintain straight and level flight at a safe altitude, were a contributing cause to spatial disorientation. We further find and conclude that the actions of the controller in giving the transmissions and instructions which he gave, induced the pilot to divert his attention from his instruments in a futile effort to locate the Allentown Airport and contributed to causing the pilot to become spatially disoriented. We find and conclude further that the controller's failure to take immediate action after the reported buzzing was a contributing factor in worsening spatial disorientation, that the pilot, in fact, became spatially disoriented, that such disorientation caused the pilot to lose control of his aircraft and to crash into the home of the plaintiffs. We find that the actions and inactions of the controller were negligent and were the proximate cause of and a substantial factor in this tragic crash.

## IV

### WILKES–BARRE

Plaintiffs contend that a reasonable controller, faced with the weather conditions existing at Allentown, had only one viable option open to him; i. e., to direct 91L to Wilkes-Barre. Admittedly, VFR conditions existed at Wilkes-Barre, and a safe journey there was possible, under IFR conditions given "tops" of not more than 10,000 feet. (91L had an altitude range of 10,000 feet). Plaintiffs contend that since 91L had been successfully flying in IFR conditions for more than the time necessary to reach Wilkes-Barre, that with proper advice from a trained controller, there was no reason to expect other than a safe journey, and that Wilkes-Barre was clearly the only feasible choice. Defendant contends, on the other hand, that for 91L to have attempted to fly to Wilkes-Barre in IFR conditions would have resulted in a crash, albeit at a different location, but a crash nonetheless. Defendant argues that spatial disorientation would have attacked or overcome 91L before his reaching Wilkes-Barre, and that, therefore, Allentown offered the safest place to land.

Both sides seem to be in agreement that assuming that the tops of the cloud cover had been at 5,000 feet, or thereabouts, (A) a safe journey to Wilkes-Barre was to be expected, and (B) the controller was under a duty to have advised 91L to climb to that level and then to provide a VFR vector to Wilkes-Barre. Thus, the threshold question is what were the controller's duties relative to knowing or learning what the overall weather conditions were at Wilkes-Barre, and particularly between ABE and Wilkes-Barre.

On August 23, 1974, Karl Gasker reported for work as an air traffic controller at the Allentown-Bethlehem-Easton Airport. He was there for the midnight to 8:00 A.M. shift to work all five control positions, and was the only air traffic controller on duty at the airport that night. Upon reporting for duty, it was his obligation to act in accordance with the Air Traffic Control Manual which has been described by the controller and others as the "bible" or "the law for air traffic controllers". Section 60

of that manual requires a controller to "become familiar with pertinent weather information when coming on duty". In the performance of that mandatory duty, Gasker says he did report to the weather office, and found out the pertinent weather information when he came on duty, and was briefed by the controller who was going off duty. However, at the time of the trial, he testified that he could not remember what that report indicated in regard to the weather for Allentown and surrounding area, other than the published report which made no mention of "tops", i. e., the uppermost limit of the overcast. Section 60 also imposes a continuing duty on the controller and requires him to "stay aware of current weather information needed to perform air traffic control duties". One of the standard methods to assist the controller in Section 60's requirements of "staying aware of current weather information" is by obtaining pilot weather reports, i. e., Pireps.

In certain cases, a controller is required to obtain Pirep information, whether or not same is volunteered by a pilot. This requirement is found in Section 70 of the ATCM, wherein it is stated:

"(a) Solicit[3] Pirep Weather report from pilots when one or more of the following conditions exist or are forecast for the area:

1. Ceilings at or below 5,000 feet. (This condition existed at Allentown on August 23, 1974).

2. Visibility (surface or aloft) at or less than 5 miles. (The visibility at Allentown was below this minimum).

3. Thunderstorms and related phenomena. (Thunderstorms were forecast for the Allentown area and in fact one arrived at 3:56 a. m.)"

The language to be used in order to fulfill the duty of soliciting Pireps is found in Section 70 under the term "phraseology". The appropriate language is "request flight condition at either present position, or over (fix), or along present route, or between

(fix) and (fix)." An example of a solicited Pirep would be asking 87L, "Request flight conditions between Wilkes-Barre and East Texas". No such Pireps were ever requested by Gasker on the morning in question. It must be noted that the duty to solicit Pireps exists whether or not an emergency situation occurred. In other words, the system contemplates a gathering of information that will be helpful to all pilots, not just those who may become involved in an emergency. Obviously, however, if the routine information is of benefit to those in an emergency situation, as it clearly would have been to 91L, the breach of the duty becomes actionable.

The defendant, in an attempt to indicate at least some compliance with the Pirep requirements, points to a communication from ABE at 0250:26 where ABE asked 508M, " * * * Are you VFR at five thousand?" That transmission may not have accomplished its purpose since clearly the standard phraseology which the manual calls for was not used. Moreover, had the answer by 508M, at 0250:30, stopped after the answer "negative", it would have been a proper response to the questions asked by the controller. However, pilots also have a responsibility to transmit information to controllers and in this case, the co-pilot of 508M went further than was required by the question asked and left the controller with mixed information which was not certain and, therefore, not ultimately helpful to the extent that a precise and certain response would have been. He said, " * * * We're in, uh, it looks pretty good, I doubt if you'd say VFR, but its raining real hard, we're not yet in solid clouds, but its raining very hard". While this transmission was not a solicited Pirep, it was certainly an important transmission.

The other alleged Pirep that the defendant maintains was obtained by the controller is the statement by 87L, at 0258:04, "I broke out at eight hundred", followed four seconds later by "MSL that is". That

3. Section 1(a) of the Manual defines all action verbs in the imperative sense to mean a procedure is mandatory.

transmission did not tell anyone anything new. Allentown had already told 87L that the ceiling was 400 feet. More important, it gave the controller no information as to conditions between ABE and Wilkes-Barre. While not mentioned by the defendant, the transmission by 87L, at 0257:22, when 87L says, " * * * tell Monmouth to expect, uh, quite a shift in the wind and a little light chop, uh, out of fifteen hundred" is also Pirep. However, neither 508M nor 91L were advised prior to the accident of the wind shift, nor were they advised of the light chop.

In addition to the radio transmission of 508M stating that they were not in solid clouds "at five thousand", the in-Court testimony of the co-pilot, Hoffman, on cross-examination, indicates that 508M was, in fact, not in solid clouds between Spring and the outer marker. He had no recollection of 508M being in rain at all as it overflew Allentown on the way to the outer marker. Nor did he recall rain at the outer marker until they had descended in the holding pattern itself. 508M descended from 5,000 feet to 4,000 feet and then to 3,000 feet in the holding pattern. This testimony by defendant's witness, under oath, is more than suggestive of the fact that the "tops" over ABE was 5000 feet or less. Additionally, it is logically argued that unless there had been good visibility between Spring and the outer marker, no qualified airline pilot and co-pilot such as Cruwell and Hoffman would have tested the known danger that existed from an otherwise unidentified target at an *unknown* altitude directly in their path. It is logical to conclude that 508M had flown out of the heavy rain condition caused by the thunderstorm activity to the south and east of Allentown from which direction it approached, and was above the overcast that was causing the light rain showers which began at Allentown at 2:45 A.M. and which 508M encountered, according to Hoffman, when descending into the holding pattern.

The defendant spent a great deal of time developing the proposition that weather conditions which exist at the ABE Airport must, of necessity, be the same at the Queen City Airport. The two are only six miles apart, and there are no major geographic phenomena between them that would cause a change in weather patterns. It is reasonable, therefore, to conclude that the tops of the clouds were not in excess of 5,000 feet, at a point between the PP & L building and Queen City Airport, at the outer marker, and in the general Allentown area, including Queen City Airport, at the time in issue. Since the evidence has disclosed that the weather conditions were improving to the *north* of Allentown, it is also reasonable to conclude, in the absence of any contrary evidence, that the tops would have remained at or about the 5,000-foot level, or less, for a sufficient distance to permit 91L to fly to Wilkes-Barre above the "tops" in VFR conditions.

In the context of this suit, there is no dispute that if there were tops at 5,000 feet, such information should have been given to 91L and he should either have been told to climb to 5,000 feet, and to fly to Wilkes-Barre VFR or at least been given such information so that *he* could have made an informed decision as to whether to proceed to Wilkes-Barre or attempt a landing at ABE. Since 91L had already indicated that he needed the help of the controller and had followed all other suggestions of the controller, there is no reason to believe that had the controller instructed or suggested a climb to 5,000 feet and a vector to Wilkes-Barre, that 91L would not have either complied or so elected by his own decision. That being so, this accident and perhaps no accident would have occurred.

It helps us not at all to argue that there is no direct and certain evidence as to the tops and that the controller was unaware of the fact that tops were at or near 5,000 feet in the Allentown area. That was information which the controller should have obtained. He had available to him potential information from 87L pertaining specifically to the general Wilkes-Barre area,

from the New York Center[4], and the Weather Bureau at Allentown, either through a simple telephone call or through the automatic weather writer, and he could have called Wilkes-Barre when the unidentified target first appeared. From 2:30 until 91 Lima contacted him, (other than giving routine weather reports to the IFR pilots, who were allowed to continue their approach to Allentown, despite the potential emergency which existed there), there was ample time in which to put an emergency plan into motion. That this is what a controller is supposed to do, does not appear to be disputed by the defendant. FAA literature, presented by the plaintiffs, indicates that a controller is not supposed to be a hero. He is supposed to enlist aid from other facilities. The Air Traffic Control Manual, in the section on the handling of emergencies, has numerous mandatory references to notifying the (New York) Center.

At this point it is logical to inquire how the controller could have made the suggested inquiries and, at the same time, have landed 87L and 508M. Perhaps he didn't have time under the circumstances as he handled them. He viewed his duties as requiring that 87L and 508M be given priority in the order named, leaving 91L at the bottom of the totem pole. However, that is not the way it is and that is not the way it should be. True, 87L and 508M were both approaching ABE to land in that order. Absent unusual circumstances, they were entitled to precisely the services which the controller gave them. But when Gasker saw a plane circling at an unknown altitude in the area of Queen City Airport, a small airport primarily accommodating small single-engine planes usually operated by VFR pilots, his duties and priorities changed. He was then put on notice of a possible emergency, and considering Gasker's description and drawing of the irregular circles and erratic track of such plane, as seen on ra-

dar, the lack of visibility and poor weather conditions in the area, he was practically assured of problems and potential emergencies to come involving this unidentified aircraft. It was then that he could have placed 508M in a holding pattern at Solberg or Spring and 87L in a holding pattern at East Texas VOR or at Reading. So handled, Gasker would have had ample time and opportunity to have given Rothschild the time, attention and instructions required to have avoided spatial disorientation and perhaps set him on VFR course to Wilkes-Barre.

Plaintiffs further contend that the controller was negligent in even suggesting ABE as a landing site. When one considers the adverse weather conditions existing at ABE and the fact that a VFR pilot such as Rothschild was involved, with his training or lack of it, there is no real dispute that ABE was not a suitable landing site, regardless of the existence or non-existence of tops at 5,000 feet.

A quick review of the evidence suggests that there were not really two alternatives. In order to have landed at ABE, it would have been necessary for 91L to have developed, in the air and at night, a skill that he had never practiced at any time; i. e., descending in adverse IFR weather conditions for the purpose of landing. In order to land, after establishing an easterly course over the airport, he would have had to have reversed course and to have turned from an easterly path over the airport to a westwardly one. He would then have had to fly westwardly, past the outer marker, make a left turn, make another left turn, come in over the outer marker and then make a blind let-down with a 300-foot ceiling and visibility of two and one-half miles[5] on the ground. Moreover, because of the rain, the visibility available to the pilot would have been substantially lessened and particularly so when one considers that "slant" visibility

4. The New York Center had access to information relayed to it, upon inquiry or otherwise, from pilots flying planes over the Allentown-Wilkes-Barre area at higher altitudes who, as a matter of course, would have known the "tops".

5. While almost everything in air traffic control is measured in nautical miles, visibility is not. It is measured only in statute miles. ATCM Section 1, Word Meanings –J–.

would be even less. Defendant's expert Howell never stated precisely the effect of rain on slant visibility. The clear implication of his remarks is that visibility was materially diminished. Thus, there is no reason to expect that even if 91L had successfully made all of the maneuvers necessary to line up with the runway that he would have been able to break out and to see the runway at a point where it would have been helpful to him. If he did not see the runway, then he would have had to execute what is called a "missed approach". That means he would have to go around and do it again, and we suppose again and again until he either crashed or got it right.

On the other hand, the Wilkes-Barre alternative would have utilized skills that the pilot had already been taught and had demonstrated this night before contacting the controller; i. e., how to *fly* the airplane in instrument-weather conditions as opposed to landing it. It must be recalled that there is a difference between flying the airplane and landing the airplane. Flying the airplane had been taught to the pilot of 91L. Even in adverse weather conditions, this particular pilot had demonstrated, for approximately thirty minutes, that he had the skills to fly the airplane, provided he was left alone and not directed to start looking for the ground, for airports, for airport lights, etc. To go to Wilkes-Barre prior to 0257:42 would have required no turns, just a continuation of 91L's northbound course. After 0257:42, it would have required one turn to get from an eastwardly direction to a northerly direction. Therefore, the logical and only course available within the good judgment of a controller, should have been to offer to vector the pilot to Wilkes-Barre or at least give him the information with which the pilot could have made an informed decision to do just that.

The manual for dealing with emergencies states that when radar services are going to be utilized, one of those radar services, (1851(f)) is a "vector to VFR conditions". Nothing is said in the manual about vectoring a pilot away from VFR conditions and toward an IFR-type landing. The only way a vector is to be used is to get the pilot to VFR conditions. That was not done. no offer of a vector to Wilkes-Barre was made. Only the offer of a vector to Allentown.

It is evident that after obtaining complete weather information and after giving such information to the pilot, the controller should have inquired into the pilot's ability to land under such weather conditions. Having discovered that it was nil, the controller should have suggested that he fly to Wilkes-Barre with the aid and assistance of the controller or at least have given him that alternative or option and the information with which to intelligently exercise it. The controller should have assured the pilot that he had him on radar, that he would attempt to follow him on radar towards Wilkes-Barre, that, as the pilot approached Wilkes-Barre, he would receive Wilkes-Barre coverage, and thus assist him in reaching VFR conditions or otherwise landing. As indicated by Mr. Howell and Mr. Cruwell, the two pilots called by the defendant, there is not a great deal that has to be done in order to fly an airplane under adverse weather conditions other than violent turbulence, assuming one can fly at all, and the pilot of 91L had certainly demonstrated that he could. The pilot needs to watch the altimeter and the attitude indicator so as to know what the aircraft is doing and its position and altitude relative to the horizon. Again, it is obvious, based upon what we know about this case, (1) that Rothschild had this training and (2) that he demonstrated an ability to fly the aircraft for approximately a half hour using only his instruments. While no one can know, with absolute certainty, that the flight to Wilkes-Barre could have been made safely or that any flight can be made safely, there is reason to believe that, even if the flight had to be made in instrument-weather conditions all the way to the environs of Wilkes-Barre, it could have been done safely. At least one cannot be certain that the flight could not have been made safely. In light of the weather conditions, the pilot's abilities, and the requirements of the ATCM, the only reasonable alternative open to the controller was to suggest Wilkes-

Barre as the pilot's only choice or at least give him the weather conditions and offer to vector him there. Therefore, whether the flight could be made on top, or in instrument conditions, due care required a conscious effort to give the pilot an informed option to go to Wilkes-Barre. It is reasonable to conclude that given an informed option, the pilot would have elected the Wilkes-Barre vector. Notwithstanding the logic of such conclusion, the fact remains that there is no precise evidence as to the "tops". There is only Hoffman's mixed statement on the tape, clouded by his ambiguous testimony in the course of trial, contradicted by the testimony of Cruwell, who sat idly by and allowed Hoffman to report something to Gasker which he contends, in his testimony, was incorrect even though he knew, at the time, that an unidentified plane lurked in the fog somewhere directly ahead. (Confusingly, Hoffman doesn't know what he meant when *he* said on the tape "We'll stay away from that side"). The uncertainty as to the "tops" is due to failure of Gasker to have obtained accurate information via Pireps, contact with New York Center, the weather bureau, etc. Thus, we are justified, we think, in reaching the foregoing conclusions.

■ On the other hand, given the fact that, for whatever reason, there is no direct evidence as to "tops" and that any finding and conclusion with respect thereto rests upon "thin ice", the fact remains that Gasker did not seek, through Pireps and otherwise, the necessary information as to "tops" and did not give to Rothschild the information required to make an informed decision as the pilot in charge. Hence, eliminating entirely a finding as to "tops", we nonetheless find Gasker negligent in not obtaining such information, which negligence was a substantial factor in the crash which subsequently occurred. Gasker's action or inaction were the cause of or contributed to Rothschild's spatial disorientation and spatial disorientation was a substantial factor in the cause of the accident.

## V

## BUZZING

In view of our prior findings and conclusions, we deem it unnecessary to make and we make no determination at this time as to whether the controller was also negligent in failing to maintain proper separation between 508M and 91L resulting in the "buzzing" described by the deceased pilot and the subsequent crash.

## VI

## THE PLAINTIFFS' CASES

■ Where, as here, a pilot places himself in the hands of the controller and thereafter follows the controller's suggestions or instructions, the pilot is entitled to rely upon such information and directions and is not free or expected to disregard same. The court, in *Yates v. United States*, 10 Cir., 497 F.2d 878 (1974), said:

"It is familiar law that one in the care and custody of another where the circumstances deprive the person of an ordinary opportunity to protect himself has a right to expect that the person exercising the custody shall use reasonable care and caution for his protection."

Although the obligation imposed upon air traffic control may seem to be exacting and heavy, it must be remembered that the degree of care required to constitute ordinary care increases according to the dangers to be reasonably apprehended in given situations. What might be held to meet the ordinary standard of care in some other situations does not necessarily measure up to ordinary care in an air traffic control room where, as the courts have noted, there is always the possibility that tragic accidents may occur in a matter of seconds if controllers who assume a high responsibility, relax from constantly overseeing an aircraft to promote its safety in flight. *Hennessey v. United States*, 12 Avi. 17, 410 (N.D.Cal.1971). We conclude that the standard of care required of the controller on August 23, 1974, was not met.

■ Government regulations, having the force and effect of law, provide that a pilot

retains primary responsibility for the movement of the aircraft. However, before a pilot can be held legally responsible, he must be supplied with those pertinent facts that he is not in a position to know for himself. Those pertinent facts which the controller is expected to provide to pilots include current weather. That was not done here. *Martin v. United States,* 586 F.2d 1206 (8th Cir. 1978); *American Airlines, Inc. v. United States,* 418 F.2d 180 (5th Cir. 1969); *Hartz v. United States,* 387 F.2d 870 (5th Cir. 1968); *Ingham v. Eastern Air Lines,* 373 F.2d 227 (2d Cir. 1967) *cert. denied* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1968); *Todd v. United States,* 384 F.Supp. 1284, 1291 (M.D.Fla.1975).

■ As previously stated, this is essentially a negligence case. In suits for injuries sustained in air crashes, no special rules are applicable only to airplanes. Rather, the general rules of negligence apply. *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964); *American Airlines, Inc. v. United States, supra.* Therefore, the tort standards of duty, the breach of same, and causation remain as in any tort case. An excellent overview of the applicable law is to be found in *Dreyer v. United States,* 349 F.Supp. 296 (N.D.Ohio 1972), at page 305:

"* * * Under the Federal Tort Claims Act, the United States assumes responsibility for the negligent acts and omissions of its agents and employees acting in the course of their employment, where a private person, under the same circumstances, would be liable to a claimant in accordance with the law of the forum where the act or omission occurred. 28 U.S.C. § 1346(b). In the cases under consideration, this would be the law of Ohio. That responsibility extends to acts or omissions of governmental employees in the operation of the air traffic control system in general, *Eastern Air Lines v. Union Trust Co.,* 95 U.S.App.D.C. 189, 221 F.2d 62 (1955), including acts or omissions of air traffic controllers affording radar service to controlled aircraft. *Maryland for Use of Meyer v. United States,* 257 F.Supp. 768 (D.C.1966). It is

now settled that once the government undertakes to perform a service not otherwise required by specific legislation, it must conform to the standards which it sets for itself and must exercise ordinary and reasonable care in the discharge of the responsibility it has assumed. *Ingham v. Eastern Airlines,* 373 F.2d 227 (C.A. 2, 1967); *Harris v. United States,* 333 F.Supp. 870 (N.D.Tex.1971); *Wasilko v. United States,* 300 F.Supp. 573 (N.D. Ohio 1967), *aff'd* 412 F.2d 859 (C.A. 6, 1969). The law in this regard as applied to aviation cases is summarized in *Hennessey v. United States,* (N.D.Cal. No. 44551, 4/26/71), wherein Judge Sweigert stated.

The courts, construing the Federal Aviation Act of 1958 (49 U.S.C. 1301 *et seq.*), the Federal Aviation Regulations promulgated thereunder (Title 14 CFR, Aeronautics and Space) and the standards adopted by the Federal Aviation Administration itself (FAA) in its Air Traffic Control Procedures Manual (ATP), have consistently held that the United States Government, having assumed the responsibility of operating an air traffic control system, involving the safety of aircraft, passengers, crews and cargoes, must meet its responsibility according to the standards of reasonable care; that this duty is not limited by any concept that the extent of its care in this respect rests within its own discretion; that neither is its duty in this respect limited by the letter of its own regulations, policies or manuals; that the government is liable under the Federal Tort Claims Act, 28 U.S.C. 1346 for the negligent act or omission of its employees in the operation of its traffic control system under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law where the act or omission occurred." *Id.* at pp. 17–18.

The defendant does not seriously dispute the fact that if there was negligence on the part of the controller which caused the crash of 91L into the Himmler home, that

the controller breached his duty to the Himmlers. Indeed, since *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), and the Federal Aviation Act of 1958, 49 U.S.C. Sec. 1348(c) it would do it no good to so argue. Rather, it argues that the controller was not negligent and that the Himmlers were damaged due solely and exclusively to the conceded negligence of the pilot Rothschild.

▪ The defendant contends that the whole problem in this accident was that a VFR pilot got himself trapped in IFR weather conditions and crashed as a result. While it is certainly true that a pilot is in control of his airplane, *Martin v. United States, supra,* and the controller can't fly it for him, it does not mean that a controller cannot also be negligent in his handling of the pilot and the situation at hand. The standard of care in aviation cases has been held to be concurrent, and responsibility rests upon both the pilot and control tower personnel. *Air Crash Disaster at New Orleans, etc.,* 544 F.2d 270, 276 (6th Cir. 1976). In *Freeman v. United States,* 509 F.2d 626 (6th Cir. 1975) the court made it clear that concurrent or even intervening negligence of a pilot and jump master, did not exonerate the Government.

▪ A controller has a duty to report weather changes which, under the circumstances, a pilot would consider important in deciding whether to try to land and in preparing for the conditions he would meet in landing. *Deweese v. United States,* 576 F.2d 802 (10th Cir. 1978); *Ingham v. Eastern Air Lines, Inc., supra.*

In *Ingham,* visibility had dropped from one mile to three-quarters of a mile. In *Deweese* the ceiling dropped from four hundred feet to three hundred feet, and the visibility was up and down between two and a half and three miles. The defendant contends that this pilot, in the air for approximately thirty minutes with no direct proof of the ceiling and visibility at his take-off, would have had to know the weather at ABE. The controller was nonetheless under a duty to inform the pilot of 91L of the changing and most current weather information. His failure to do so deprived Rothschild of important information necessary for an informed decision as to whether to attempt a landing at ABE, or fly to Wilkes-Barre. As suggested by *Deweese,* knowledge of the ceiling and visibility could have influenced the pilot to reject the offer of a surveillance approach to Allentown.

In *Stork v. United States,* 430 F.2d 1104 (9th Cir. 1970), a certified instrument-rated charter pilot was scheduled to transport a football team back to California from Ohio. At take-off, visibility was zero miles, in fog; i. e., 165 feet. FAA regulations would prohibit a pilot from taking off in those circumstances. The pilot requested a take-off clearance and reported he could see three lights—the farthest being 600 feet away. Clearance was granted and the plane, after swerving right and then left, made a premature take-off, stalled and crashed. The Government argued, as here, that the controlling decision was for the pilot, and that traffic controllers have no authority to substitute their own judgment for that of the pilot. In *Stork,* differing from *Himmler,* there was no doubt that the pilot was completely aware of the weather conditions facing him. In spite of that, and the Government position that warnings from the tower are not required when it is apparent that the pilot is in possession of all the facts known to the controllers, the court said " * * * his apparent knowledge will not obviate the need for warning when he is proceeding in the face of extreme danger known to the tower". *Id.* p. 1108. The Government also argued proximate cause. The court disposed of this argument by stating:

"We find no merit in the contention of the United States that this breach of duty was not a proximate cause of the crash. It is clear from the record that take-off was in reliance upon the unqualified grant of clearance by the tower, and that even the most cursory statement of caution might have caused the pilot to abandon the fatal take-off. * * *" *Id.* 1108.

The facts of the present case are even stronger for the issuance of warnings than was *Stork*. In this case, there is no testimony that the pilot of 91L had actual knowledge of the weather conditions at Allentown. The controller assumed he did, but as *Stork* teaches, even actual knowledge does not negate the need for a warning. In addition to the absence of weather warning, there was never a warning about the pressing need to continue to monitor the plane's instruments, nor that the pilot should not be distracted by events outside the cockpit. Here, instead of warnings that could have avoided spatial disorientation, we have a continuing series of advice and instructions calculated to do just the opposite. The instructions here caused the pilot to look away from the safety of his instruments, in a futile visual search for an airport hidden by clouds, resulting in disorientation as demonstrated by the Barony chair in the courtroom. The defendant's argument that it was all the pilot's fault, overlooks the fact that when 91L became trapped in IFR conditions the duty owed by the controller increased, not decreased. In *Hochrein v. United States*, 238 F.Supp. 317 (E.D.Pa. 1965), the court correctly observed: "A person cannot be held liable for another's negligence, but the second party's (controller's) negligence can arise from a duty imposed as a result of the original negligence. If * * * (first pilot) was negligent, and we consider he was, the question of the defendant United States' liability rests on whether or not * * * (the controller) had a duty to take some action to warn * * * (the second pilot) * * * *". The court concluded that such duty existed, and found that the defendant had breached its duty.

In the present case, the existence of an emergency situation is recognized. Both the ATCM and the training program for controllers are designed to equip controllers to handle emergencies. The situation of a lost pilot or a pilot trapped in adverse weather conditions is not a unique emergency. *Hochrein* recognizes that an air traffic controller's duty to aircraft in his control zone is contained in the Air Traffic Control Rules and the ANC Manual. These rules and regulations have the force and effect of law. Since *Hochrein* was decided, the courts have also held that the ATCM while creating a standard of care does not create an exclusive standard.

In *Martin v. United States, supra*, the Government itself conceded that the duty of a controller goes beyond the duties imposed by the operating manuals of the FAA. *Hartz v. United States, supra; United Air Lines, Inc. v. Wiener*, 335 F.2d 379 (9th Cir. 1964); *Ingham v. Eastern Airlines, Inc., supra*. The controller has a duty to exercise judgment to attempt to avoid danger where such danger was, or should have been, obviously imminent under the circumstances. *Furumizo v. United States*, 245 F.Supp. 981 (D.C.Hawaii 1965).

## VII

### THE DEFENDANT'S CASES

In none of the cases cited by the defendant have we found the totality of negligence present in this case. Most cases involve one or sometimes two controller errors. Here we have a controller whose training was completed after the accident occurred, who was working *all* tower positions that night, who by delay and direct instructions to the pilot, brought about spatial disorientation and then, when spatial disorientation occurred, misused the brief time remaining within which the situation might have been remedied. As the cases are reviewed, these considerations must be kept in mind. If our review of many aviation cases has demonstrated any one important truism, it is that each aircraft accident must be considered in the light of its own particular circumstances. *Neff v. United States*, 282 F.Supp. 910 (D.C.1968); *Somlo v. United States*, 416 F.2d 640, 647 (7th Cir. 1969).

The defendant cited four non-aviation cases in support of general propositions of law. *Quinones v. United States*, 492 F.2d 1269, 1274 (3d Cir. 1974); *Department of Transportation v. Bethlehem Steel Corp.*, 28 Pa.Cmwlth. 214, 368 A.2d 888 (1977); *Cole-*

co Industries, Inc. v. Berman, 423 F.Supp. 275, 310 (E.D.Pa.1976); and Yania v. Bigan, 397 Pa. 316, 155 A.2d 343 (1959). Since these cases are cited for general propositions, no extended discussion of them is warranted. However, we feel compelled to comment on the defendant's reliance upon Yania v. Bigan, supra, cited for the proposition that the conduct of Rothschild putting himself in instrument weather conditions would be labeled reckless under Pennsylvania law. Yania was an adult male in full possession of his faculties, who deliberately jumped into a strip-mine trench with walls sixteen to eighteen feet high, and water eight to ten feet deep, and drowned as a result. The complaint against defendant-owner of the strip mine alleged that the owner had urged and enticed Yania to jump into the trench. Preliminary objections in the nature of a demurrer were sustained. The court held that the mental input of talking an adult male into jumping into a ditch was not actionable. Recklessness on Yania's part had nothing to do with the court's decision on the issue of jumping into the ditch. The issue was clearly, whether the defendant was responsible for the jumping; not whether Yania was contributorily negligent by recklessly jumping. To attempt to draw a parallel between Yania and Rothschild is unavailing at least as a defense in a suit by the Himmlers who, with their family, were enjoying a night's rest when suddenly their slumbers were interrupted by death, injury and destruction. Moreover, in Yania the danger was obvious before the jump, while in the present case, the pilot, when airborne for some twenty minutes, stated, "I didn't realize conditions were as bad as they are".

The thrust of the defense in the instant matter is that the pilot of 91L Amos Rothschild, was negligent in taking off in instrument weather conditions, and that his negligence in taking off was the sole proximate cause of the crash. Plaintiffs argue that even if Rothschild was negligent in taking off, his negligence ceased when the take-off was successful, and the controller's negligence intervened; and, that by failing to properly advise the pilot and by advising him in a way which caused spatial disorientation, the subsequent acts of the controller were the sole proximate cause and a substantial factor in the events which followed. In the alternative, they argue that the controller was concurrently negligent and that this concurrent negligence was a proximate cause of the crash. Under Pennsylvania law, if Rothschild were found to have been 99% at fault and the controller only 1% at fault, the plaintiffs are entitled to recover their damages from the defendant.

The defendant, both at trial and in its discussion of the law, has sometimes ignored the question of the controller's intervening and/or concurrent negligence. In fact, it has cited many cases in support of its position where recovery was denied plaintiffs because of their own contributory negligence, an issue not here involved. See Prashker v. Beech Aircraft Corp., 258 F.2d 602 (3d Cir. 1958); Kullberg v. United States, 271 F.Supp. 788 (W.D.Pa.1964); United States v. Miller, 303 F.2d 703 (9th Cir. 1962); Deal v. United States, 413 F.Supp. 630 (W.D.Ark.1976), 552 F.2d 255 (8th Cir. 1977); Baker v. United States, 417 F.Supp. 471 (W.D.Wash.1975); Michelmore v. United States, 299 F.Supp. 1116 (C.D.Calif.1969); Messick v. United States, 14 Avi. 17, 290 (S.D.W.Va.1976); Somlo v. United States, supra; Crossman v. United States, 378 F.Supp. 1312 (D.C.Ore.1974); Neff v. United States, 136 U.S.App.D.C. 273, 420 F.2d 115 (1969); Ross v. United States, 365 F.Supp. 1138 (D.C.Vt.1972); Todd v. United States, 384 F.Supp. 1284, 1291 (M.D.Fla. 1975); and Allegheny Airlines, Inc. v. United States, 420 F.Supp. 1339 (S.D.Ind.1976). All of the above cited cases are immediately distinguishable from the case at bar because here there was admittedly no contributory negligence on the part of plaintiffs, who were asleep in their home. If the estate of the deceased pilot were a party plaintiff, we could better understand the defendant's reliance upon these cases. However, in the absence of that fact, much of the legal reasoning is inapplicable here.

Four aviation cases have been cited by defendant for more or less general

propositions of law. In none of these was the issue of an air traffic controller's negligence present. *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975), was a products liability case where the Government has, in our view, misinterpreted the holding of the case. We agree with the Pennsylvania Supreme Court's holding that foreseeability is not a test of proximate cause; it is a test of negligence. Whether an injury could have been foreseen is irrelevant in a strict liability case. But, that is not in issue here; this *is* a negligence case. *Air Transport Associates, Inc. v. United States,* 221 F.2d 467 (9th Cir. 1955), involved a breach of contract where the Government admitted negligence, but sought to escape liability for certain damages under an exculpatory contract clause held to be void as against public policy. *Clemente et al. v. United States,* 422 F.Supp. 564 (D.C.P.R.1976), 567 F.2d 1140 (1st Cir. 1977), involved FAA inspectors' alleged negligence, not controller's negligence. However, the case includes an excellent discussion about the controller's high duty of care. *Gibbs v. United States,* 251 F.Supp. 391 (E.D.Tenn.1965) involved pilot error in overloading a plane and the question of the Government's negligence in certifying the plane as airworthy. These cases need not be discussed further as they have, in our opinion, no real or direct applicability to the instant case.

The defendant has cited several cases which we deem worthy of discussion. Some of these will be accorded brief treatment. Others, which we perceive as being relied upon more heavily, will receive fuller discussion. Those cases deserving only brief treatment are as follows: *United States v. Schultetus,* 277 F.2d 322 (5th Cir. 1960) and *United States v. Miller, supra,* are both cited to support the proposition that the ultimate responsibility for the operation of the aircraft is the pilot's, not the controller's. Both cases involved mid-air collisions between planes piloted by private VFR pilots in good VFR weather conditions. In *Schultetus,* the question of contributory negligence was not reached. In *Miller,* the plaintiff was found to have been contributorily negligent. In both cases the controllers were absolved because the pilots were in fact in good VFR weather conditions, and should have seen and avoided the other aircraft. In Schultetus, the pilot had even acknowledged having the other plane in sight. Therefore, these cases are distinguishable on their facts.

*DeVere v. True-Flite, Inc.,* 268 F.Supp. 226 (E.D.N.C.1967) was cited for the proposition that a pilot must find out the forecasted weather and cannot ignore weather information or conditions. We agree, but we are here concerned with the negligence of the controller and for that purpose the negligence of the pilot may be assumed and, for practical purposes, was assumed or admitted throughout the trial. In the *DeVere* case the pilot took off in VFR conditions and crashed several minutes after take-off after flying into some thick clouds and attempting to reestablish visual contact. No emergency was declared and there was no pilot-controller contact after take-off. Unlike the instant case, the controller in *DeVere* had correctly given the pilot, prior to take-off, the latest weather information that he had. The information was accurate and, thus, the controller was not negligent. Controller Gasker, to the contrary, failed to give any weather information to the pilot in this case, after initially observing the plane on radar, after contact, and after he had become aware of the emergency situation.

*Messick v. United States, supra,* involved the issue of a controller's authority to deny a landing clearance. The accident involved a scheduled air carrier on an ILS flight plan which crashed in fog short of the runway. The alleged negligence of the controller was that he had misinformed the pilot of the location of the fog, vis-a-vis, the runway threshold. The court found that the controller had given accurate information, and that the crew was negligent in failing to execute a missed approach. There was no emergency situation involved. It is interesting to note that the defendant, in its abbreviated quote from the opinion omitted the following:

" * * * there is no provision in the Air Traffic Control Manual which provides for the denial of a landing clearance to a *scheduled air carrier due to weather conditions.*" (Emphasis added) (*Id.* 17,-298)

Of course, this case is distinguishable from the instant case for the fact that it involved a scheduled air carrier making an ILS landing. The effect of weather upon Rothschild's ability to land versus its effect upon the ability of a commercial pilot to land is so patently obvious that no further distinction need be made. Additionally, the present case involves the offer of a vectored landing at Allentown; not whether a denial could be given if landing clearance had otherwise been requested from a pilot acting on his own initiative.

The defendant contends that Rothschild clearly knew all the facts he needed to know, and cites *Somlo v. United States, supra,* in support thereof. We have found that Rothschild was denied vital information and, indeed, did not know all the facts which he needed to know. The facts in *Somlo,* however, are not even remotely analogous to the factual situation here. Somlo, the pilot, survived the crash in which his daughters, as passengers, were killed. The crash was caused by "icing". Somlo never declared or indicated an emergency. He had received weather information indicating that icing conditions were present in the area of his destination on several separate occasions. He flew into the area anyway. He minimized his problems to the controller and in fact withheld vital information from the controller. He had ample opportunity to land safely at several alternate airports and did not do so. The controller had no reason to believe he was even in difficulty. The sole negligence alleged as against the controller handling the flight at the time of the crash was his failure to tell Somlo of icing conditions. Somlo already had this information and, in fact, had reported to the controller icing at a higher altitude and requested clearance to go lower. Somlo had actual knowledge of the icing conditions of his plane and did not alert the controller. There is simply no

comparison between the controller in *Somlo* and the controller in this case. Here the pilot was never given the information pertaining to ceiling and visibility at ABE and was, as we have found, likely misled by the controller as to the ceiling and visibility being substantially better at Allentown than it actually was.

*Crossman v. United States, supra,* is cited for the proposition that a controller was not negligent in failing to tell a pilot when radar contact was lost, and in failing to warn a pilot that he was approaching an antenna farm, where the pilot ultimately crashed into one of the antennas. *Crossman* involved a VFR pilot in good VFR weather conditions, on a VFR flight plan, not in an emergency situation, and not requesting or receiving radar assistance, who inexplicably crashed into an antenna. The pilot had acknowledged to the controller beforehand that he was aware of the antenna farm. Although radar contact was established and then lost, and although the controller did not say "radar contact lost", the pilot was VFR, and was not requesting, or expecting, or relying upon radar assistance. The court correctly held that under these circumstances the controller was entitled to rely upon the pilot's advice that he was aware of the antenna farm and, thus, no further warning was necessary; and, that because no radar assistance was required in VFR conditions, no advisory that radar contact had been lost was necessary.

*Neff v. United States, supra; Ross v. United States, supra; Martens v. United States,* 5 Avi. 17,465 (1957); and *Smerdon v. United States,* 135 F.Supp. 929 (D.Mass. 1955) are all cited by the defendant in conjunction with *Kullberg v. United States, supra,* on the issue of the controller's duty to provide information. *Neff* involved a crash of a commercial airline which had taken off into a thunderstorm that was already pelting the runway with severe rain and hail prior to the plane's take-off roll. The court found plaintiff's decedent to have been contributorily negligent in taking off. The court found no controller negligence in failing to advise the crew of weather condi-

tions which were just as obvious to the crew as to the controller (both were on the ground), and the crew had already been advised of the thunderstorms. On the contrary, the weather conditions (ceiling and visibility) at ABE were not so. equally obvious to the pilot and the controller (one was on the ground, the other in the air). Here, the controller was obviously in a better position than the pilot to know the conditions as to "tops" etc., or to have discovered through Pireps, through the New York Center, or through the weather bureau the existence of the total weather picture, including "tops".

*Ross* concerned two twin-engine, instrument-rated pilots, who crashed into a mountain while in VFR conditions (thirty-mile visibility). The plane was not radar-identified and the controller had no knowledge that it was heading toward the mountain at an unsafe altitude. Therefore, the court found no duty to warn. Clearly, the pilots were negligent and recovery was barred. There was no controller negligence.

In *Martens*, the negligence alleged was that the controller failed to determine the type of flight license held by the pilot prior to granting take-off clearance. There is no discernible reason for the defendant to have cited this case.

*Smerdon* involved an instrument-rated pilot on an IFR flight plan who crashed short of Logan Field into the Boston harbor. The pilot was told by the controller that visibility was ⅜ of a mile. The pilot misunderstood, through no fault of the controller, a VFR weather advisory pertaining to a close-by airport as pertaining to Logan, but indicated he was VFR and could see the runway at Logan. The court held that it was not the controller's duty to dispute the pilot's visibility and found no negligence. The case is not helpful to a determination of the issue before this Court.

The defendant has cited *Todd v. United States, supra,* to show that an FSS attendant's omission of a report—"* * * ridges obscured in all quadrants * * *"—was not negligent. In fact, the court found negligence in several respects, and barred

recovery only because of the contributory negligence of plaintiff's decedent. With respect to the omission, the court considered "the totality of the circumstances" which included the fact that the pilot had been given the information omitted on at least two prior occasions. The *Todd* court quoted with approval the language of *American Airlines, Inc. v. United States, supra,* to the effect that an air traffic controller must give the warnings specified by the manuals and, whether or not required by the manuals, must warn of dangers reasonably apparent to him. Here, Gasker should have warned Rothschild of the low ceiling and poor visibility at ABE and should have obtained or sought to obtain information as to the "tops" between ABE and Wilkes-Barre.

The defendant has cited *Gatenby v. Altoona Aviation Corp.,* 407 F.2d 443 (3d Cir. 1968) as support for three propositions, namely, (1) that violations of FAR's is negligence as a matter of law; (2) that a pilot has a duty to learn the weather conditions; and (3) that the Third Circuit does not attempt to shift the responsibilities of a pilot to a controller. There is no support in the opinion for proposition number 3. *Gatenby* involved a suit brought by the estate of two passengers against a common carrier. The United States was not a party, and there was no allegation of controller error. The *Gatenby* case is distinguishable from the case at bar in that a common carrier (held to the highest standard of care) was negligent, and there was no allegation of negligence, nor was there any discernible involvement on the part of the United States through its controller. Since the issue of pilot Rothschild's negligence is not determinative of this matter, the *Gatenby* case has little application to the facts of the case before this Court.

*Prashker v. Beech Aircraft Corp.,* 258 F.2d 602 (3d Cir. 1958) and *Weissman v. Prashker,* 405 Pa. 226, 175 A.2d 63 (1961) are cases arising from the same accident. The Federal Court action was brought by the pilot's estate against the aircraft manufacturer. The State court action involved

the estate of a passenger against the pilot's estate, and his insurer, as garnishee. The defendant relies on both cases to establish the duty of a pilot to know and heed weather conditions and pilot awareness of spatial disorientation; and to show that the Third Circuit does not shift pilot responsibility to the controller. Again, neither case supports the latter proposition. *Weissman*, of course, was never treated by the Third Circuit; it was a State court proceeding. Moreover, neither case involved the United States, nor any allegation of controller negligence and, therefore, could not possibly support such proposition. In the Federal case, recovery was denied because plaintiff failed to show a design defect, and because the pilot was found negligent. Although the pilot's contributory negligence in flying into IFR conditions was a factor, the court also found that it was arguable that bad weather had closed in suddenly. This argument found support in the State court opinion. Neither case is helpful in the resolution of the issues here involved because the issue of pilot negligence is not solely determinative of this case. The question in this case deals with controller's negligence, either superseding or concurring with the pilot's negligence.

While ignoring *Hochrein v. United States, supra,* from the Eastern District of Pennsylvania in 1965, the defendant seems to place great reliance on *Kullberg v. United States, supra,* and *Rowe v. United States,* 272 F.Supp. 462 (W.D.Pa.1964) from the Western District of Pennsylvania, a year earlier. These cases were companion cases tried before the same judge. *Kullberg* was brought by the estate of the deceased pilot; *Rowe,* by the estates of two deceased passengers. The cases are distinguishable from the instant case in many respects, and the defendant's reliance is again misplaced. The facts are briefly as follows: Kullberg was a non-instrument rated pilot. However, when he contacted the controller he advised that he desired a radar-assisted approach for landing. No declaration of an emergency was made, nor was there any indication from pilot to controller that there was any difficulty at all.

The pilot had been given all pertinent weather information. At the time of the pilot's initial contact, he reported VFR "on top" and knew he would have to descend through the clouds for landing. He did not tell the controller he was only a VFR pilot. In fact, in view of his request for a radar-assisted approach it appears that a reasonable inference can be made that the controller was justified in assuming that Kullberg was an instrument-rated pilot. The plane went out of control due to either icing, turbulence or pilot disorientation. It sustained in-flight break-up and crashed. The principal allegations of negligence as to the controller were that he failed to warn the pilot of hazardous weather conditions, failed to direct him to a safer airport and, descended him into bad weather. Here again, the facts are distinguishable. Unlike Rothschild, Kullberg was VFR above the overcast; never declared an emergency; never gave any indication of difficulty; misled the controller as to his capabilities; requested an IFR approach and radar assistance in his let-down; did not advise the controller that he was not instrument-rated; and accepted clearances taking him from VFR conditions into IFR conditions. The facts are not comparable to the facts here. The fact that the controller knew so little about the pilot was because of the pilot's own actions in not advising of an emergency, or that he was a VFR pilot. Hence, the court declined to find controller negligence. The controller was also aware of the tops. Gasker was not, although he should have been. Obviously, the facts known to Controller Gasker were vastly different from the facts known to the approach controller in *Kullberg.*

On the question of advising the pilot about another airport, the court did not rule out negligence, but simply found no duty to order the plane to another airport, "* * * under the circumstances *of this case*"; i. e., the controller did not know that he was dealing with a VFR pilot. (See Finding of Fact # 51, at page 794) Also, the pilot should have declared an emergency. (See Finding of Fact # 52, at page

795) If the pilot had declared an emergency, as the court went on to state, the controller could have ascertained the nature of the emergency and then, as the situation warranted, have adopted one of two courses: " * * * (2) after determining from information supplied by the pilot and other FAA facilities that a suitable alternate airport was in fact available, directing the Cessna to it". (See Finding of Fact # 53, at page 795) Actually, when the factual distinctions between the two cases are recognized, *Kullberg* and *Rowe* are supportive of the plaintiffs' contentions that Wilkes-Barre was the only permissible choice. The court concluded that " * * * there is no duty for an approach controller to volunteer weather information except in accordance with (Manual sections) * * * or if he has previously given such aircraft dangerously inaccurate or misleading information, or perhaps *unless he has actual knowledge of a hazardous current weather condition which the aircraft may encounter in flight and of which it may not yet be aware* ". (*Id.* 800) (Emphasis added) Such language, applied to this case, would impose a duty upon Mr. Gasker to provide weather information:

"7. The approach controller owed no duty to Kullberg or any other occupant * * * in the circumstances of this case * * * concerning the advisability of a landing at an alternate airport, or to order the pilot to do so, *in the absence of any declaration of emergency or other indication of difficulty made to him by the pilot.*" (Emphasis added) (See Conclusion of Law # 7, at page 800).

Conversely, in the instant case, there was such a declaration of emergency and an indication of no familiarity with IFR landings. It, therefore, follows that *Kullberg* establishes a duty in a case such as *Himmler.* In *Kullberg* and *Rowe,* the controller was acting in a vacuum without vital information and, therefore, the "pilot-in-command" theory was unconditionally applicable. Any decision made by Kullberg was completely unilateral since the controller had no knowledge of any difficulty and obviously never had an opportunity to consider the grant or denial of a landing clearance. Indeed, close examination of these cases establishes that they support this Court's findings of negligence and causation with respect to the control of 91L.

The defendant cites *Dugas v. National Aircraft,* 310 F.Supp. 21 (E.D.Pa.1970) (*Dugas* I) *aff'd in part, vac. in part,* 438 F.2d 1386 (3d Cir. 1971) (*Dugas* II), and 340 F.Supp. 324 (E.D.Pa.1972) (*Dugas* III). *Dugas* II and III are not pertinent since they deal with the questions of the applicability of the Death on the High Seas Act and damages. *Dugas* I involved a case where a plane crashed at sea after taking off from South Caicos Island for Puerto Rico. The pilot was warned of bad weather by the manager of a small airport. The plane was never heard from after take-off. *The United States was not a party.* Without any issue of controller negligence, it is difficult to perceive the reason *Dugas* is cited by the defendant. When the plane crashed without explanation, *res ipsa loquitur* applied to support the conclusion that there was pilot negligence. The pilot took off despite a warning of severe weather, when he was not instrument-rated. As we perceive it, there is nothing further to be gleaned from the case.

*Fidelity Bank v. United States,* 13 Avi. 18,356 (E.D.Pa.1976) is cited for the proposition that the failure of a pilot to comply with FAR's and good operating procedures resulted in and was the *sole* proximate cause of the crash. If the facts here supported such a proposition, reference to *Fidelity* might have some import. However, the case is completely inapposite to anything here involved. In fact, in *Fidelity,* the pilot was not negligent and complied with all FAR's. The crash occurred when an engine failed on take-off, throwing the twin-engine plane out of control and causing it to collide with a water tower near the runway. The United States was sued on the theory that the airport layout design published by the Government misplaced the location of the tower. There was no allegation of controller negligence and the error in the tower location was

found not to be the proximate cause of the crash. The case is not applicable to the instant case.

*Lightenburger v. United States,* 460 F.2d 391 (9th Cir. 1972) is cited for the same proposition as *Fidelity.* It is likewise inapposite. *Lightenburger* involved a small plane encountering wing tip vortices upon attempted landing, 12½ minutes after a large jet executed a missed approached. The issue was whether the controller was negligent in failing to warn the pilot of the small plane of the wake turbulence. He was found not to have been negligent because all the evidence supported a finding that turbulence lasting as long as 12½ minutes was unheard of and, therefore, not foreseeable. Plaintiffs' own expert acknowledged that he had never heard of turbulence persisting for more than 6½ minutes. There is no applicability of *Lightenburger* to the instant factual situation.

The defendant relies on *Black v. United States,* 441 F.2d 741 (5th Cir. 1971) to support the statement that, "(T)he pilot-in-command has the primary duty and is the first authority as to all decisions affecting the safety of flight. Those duties and responsibilities cannot be imposed upon *an air traffic controller* on the ground". (Emphasis added) The sole issue in *Black* was whether the United States was negligent because a Flight Service Station attendant, not a controller, failed to advise the pilot of a SIGMET in an area 150 miles from the FSS. The pilot was on a VFR flight plan and did not advise FSS of his destination or route. The SIGMET was broadcast intermittently and could have been heard by the pilot some twelve hours after the contact with FSS. The FSS contact was the *only* contact between the pilot and the ground during the entire flight. *There was no pilot-controller contact.* The court found that the Government's negligence had so far spent itself as to be too small for the law's notice, and was superseded by the pilot's negligence in flying into a storm which was found to be the proximate cause. *Black* did not relate to the pilot-in-command theory vis-a-vis the duties of a controller. There was no controller action, or inaction, involved in that case.

*Deal v. United States, supra,* is cited for the following propositions: (1) that what information the controller should solicit from a pilot in an emergency situation requires the controller to exercise his best judgment and that failure to ask questions required by the ATCM in no way contributed to the accident; (2) that elements of judgment and discretion may be more relevant in any given situation than ATCM provisions; (3) that a controller has no duty to relay a Pirep from another aircraft "a considerable distance to the west"; (4) that a "technical" failure to report weather information was not a proximate cause of the accident; (5) that speculation will not suffice to hold the Government liable; and (6) that, generally, Gasker's failure to relay weather information in no way contributed to the accident. *Deal* arose as a result of the crash of a plane, on an instrument flight plan, piloted by an instrument-rated pilot, which crashed when the pilot failed to make a proper final approach and, while executing a missed approach, turned too sharply and lowered the left wing so sharply that the plane stalled and crashed. Prior to the crash the pilot had reported icing and had requested permission to change altitudes. Apparently, the icing conditions had abated by the time of the landing approach. Icing was found *not* to have been the proximate cause. As to the air traffic controller, the allegations of negligence were generally that he failed to treat the situation as an emergency, failed to relay a Pirep that icing was not present at a higher altitude, and failed to interrogate the pilot as required in an emergency. The controller was found not to be negligent under the facts of the case.

An immediate distinction between *Deal* and the instant case is that *Deal* was on an IFR flight plan. Under those circumstances, the court found that the controller already had the answers to the questions which would have been asked of the pilot. Such was not true in the case before the Court. Another obvious distinction in *Deal* rested in the fact that the pilot never indi-

cated that he was in an emergency situation. There was a question as to a transmission of "heavy icing" which would have constituted an emergency; however, the court found that the controller never heard that transmission and that, in any event, icing was not the proximate cause of the crash. With respect to the failure to relay a Pirep from a plane "a considerable distance to the west", it should be noted that there was no indication just what the "considerable" distance was, or that the Pirep concerned icing. Icing was not an issue here; however, it is apparent that icing is a weather phenomenon quite different from the rain and "tops" involved here. Icing can be present in pockets, at varying altitudes over the same general area. Moreover, in *Deal* there was no allegation that the controller failed to report any significant weather information, except for the Pirep. Finally, the determinative distinction between *Deal* and *Himmler* is that the pilot's communications did not indicate that he considered himself in an emergency situation and, thus, the controller did not breach his duty to exercise his best judgment. In the instant case, there was an emergency which was acknowledged by all witnesses. One other interesting observation with respect to *Deal* is that it was brought by the estates of the pilot *and his five passengers*. With respect to the passengers' actions the court noted that the representatives of the passengers' estates were entitled to recover the full amount of damages they sustained if the United States could be found to have been negligent in any degree and that the slightest degree of negligence proximately caused the accident. The *Deal* passengers and the *Himmlers* were similarly situated.

*Baker v. United States, supra,* was cited in conjunction with *Deal* as to the duty to warn. *Baker* was brought by the estates of two crew members after their plane crashed into Mt. Rainier. The plane was piloted by persons holding Air Transport licenses. In *Baker*, the flight was on a VFR flight plan. IFR conditions were never reported; an emergency was never declared or indicated, and an erroneous report of their location

was given to the controller. Moreover, no employee of the Government was, or had reason to be, aware of any danger to the aircraft. Under these circumstances, the court found that no duty to warn, assist or advise had been breached by the controller, and that the crew was negligent. The case is not analogous to the matter in issue.

The defendant also relies on *Michelmore v. United States*, 299 F.Supp. 1116 (C.D.Cal. 1969) and *Spaulding v. United States*, 455 F.2d 222 (9th Cir. 1972). *Spaulding* was a companion case to *Michelmore* and appealed. *Michelmore* is cited with respect to the pilot-in-command theory; the duty of a controller to order an aircraft to an alternate airport; and for the proposition that only the pilot can know his, and his aircraft's, capabilities. It involved a private, multi-engine non-instrument-rated pilot. When he notified the control tower that he was not in VFR conditions and not instrument-rated, the controller advised that, under the existing weather conditions, he *could not* authorize landing clearance unless there was an emergency, and indicated that he had ILS equipment and was familiar with an ILS approach and requested a "letdown". The pilot had all available weather information. The theory of the plaintiffs in *Michelmore*, which is similar to a theory argued by the Himmlers, is that the approach controller was negligent in directing a turn while the plane was descending, and in giving too steep a turn. The facts, however, are distinguishable, and what made the controller's action in *Michelmore* non-negligent are the very things that make the negligence apparent in *Himmler*. In *Michelmore*, the aircraft was equipped with an automatic pilot to make the turns, and the pilot had advised of his familiarity with ILS equipment. Rothschild had no such equipment or familiarity. Further, in *Michelmore*, the turn was necessary for, and given for, radar identification purposes. Here, Gasker contends that he had 91L in radar contact several minutes before issuing the instruction to turn. At the very least there is no contention here that the turn was directed for radar identification purposes.

Finally, the *Michelmore* court found against the plaintiff on this issue and held that the pilot was *not* given a direction to turn and descend at the same time; whereas, here, even defendant's experts acknowledge that a direction to turn and climb *was* given at the same time. And, most importantly, in *Michelmore*, the turns could have been made on auto-pilot and there was nothing to indicate they could not be made safely; clearly, a completely different set of circumstances than were here involved with 91L. Accordingly, the *Michelmore* case is distinguishable.

On appeal, the *Michelmore* case became *Spaulding, supra. Spaulding* is likewise of no assistance to defendant because the lower court had found the various controllers did everything right. The pilot was not only given the weather, but the correct weather; i. e., VFR, but with thunderstorms in the area. The pilot called the Austin tower and reported VFR conditions but then, almost immediately, changed and said he had lost VFR. The pilot then stated, on his own, that he wanted to "get down". This was not the controller's idea. As indicated in the District Court opinion, before concurring in the pilot's request to land, the controller asked whether the plane was equipped with ILS landing equipment and whether the pilot was familiar with an ILS landing. The pilot in *Spaulding*, differing from Rothschild, was familiar with ILS landings, and the plane was equipped for such a landing. *Only after learning this did the controller approve a descent.* The controller had a right to assume the pilot was correct and could make an ILS landing. In *Himmler*, despite the pilot's statement that he could not make an ILS landing, the controller ignored his lack of qualifications and started to proceed with an approach to landing.

In *Spaulding*, the pilot was given a standard turn to establish radar contact and was instructed after the turn to descend. He crashed within seconds. In the District Court, plaintiff had argued that the turn and descend order were given together. Defendant denied this. The lower court considered this issue very material and im-

plied such an instruction would have been negligent, but, on the disputed question, the lower court, as a matter of fact, found no such instruction, saying:

"At the expiration of sufficient time to have made the turn (the pilot) was instructed to descend * * *.

"Plaintiffs are incorrect in their assertion that the pilot was given direction to turn and descend at the same time, as the record clearly shows the order to descend was given after sufficient time had elapsed for (the pilot) to have completed the turn as directed." (Page 1121, Dist. Ct.)

Here, the defendant's expert, Rintoul, among others, testified that an instruction to climb was given by the controller while the plane was in a turn. This testimony supplements and supports the recorded conversation which infers the same thing. Thus, the negligence established in *Himmler* was non-existent in *Spaulding*. Additionally, the case has merit from the plaintiff's standpoint both because the negligence that did not exist in *Spaulding* does exist in *Himmler* and because the Circuit Court, although finding no controller negligence, stepped away from the lower court's reliance on the "pilot-in-command" theory, and recognized the concurrent duties of pilot and controller, saying at page 226 (footnotes included):

"While general negligence law applies to airplane tort cases, *United States v. Schultetus*, 277 F.2d 322, 325 (5th Cir. 1960), *the standard of due care is concurrent,* resting upon both the airplane pilot and ground aviation personnel. *Both are responsible* for the safe conduct of the aircraft. *United States v. Miller*, 303 F.2d 703 (9th Cir. 1962). Thus, both are responsible for the safety of airplane passengers. The pilot is in command of his aircraft. He is directly responsible and has final authority for its operation. See 14 C.F.R. § 91.3(a). However, before the pilot is held legally responsible for his aircraft, he must know those facts which are material to the operation of his plane.

"An important source of this information is tower personnel, air traffic controllers, and service station personnel. The air traffic controller is required to give all information and warnings specified in his manuals,[7] and in certain situa-

[7] *Gill v. United States*, 429 F.2d 1072 (5th Cir. 1970); *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227 (2nd Cir. 1967); *Stork v. United States*, 278 F.Supp. 869 (S.D.Calif.1967); aff'd 430 F.2d 1104 (9th Cir. 1970).

tions he must give warnings beyond the manuals.[8] This duty to warn is based on

[8] For example, warnings beyond those prescribed by the aviation manuals must be given when danger is immediate and extreme, *United States v. Furumizo*, 381 F.2d 965 (9th Cir. 1967); when danger is known only to federal personnel, *United Air Lines, Inc. v. Wiener*, 335 F.2d 379 (9th Cir. 1964); when the controller is better qualified than the pilot to evaluate the actual situation, *Hartz v. United States*, 387 F.2d 870 (5th Cir. 1968); or when the controller is able to gather more information or make more accurate observations than the pilot. *Hochrein v. United States*, 238 F.Supp. 317 (E.D.Pa.1965).

the simple tort principle that once the Government has assumed a function or service, it is liable for negligent performance.[9]

[9] *Indian Towing Company, Inc. v. United States*, 350 U.S. 61, 64–65, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *American Airlines, Inc. v. United States*, 418 F.2d 180, 192 (5th Cir. 1969); see generally, Annot., 86 A.L.R.2d 384 (1962)."

As to the controller's instructions, unlike the instructions given 91L which were designed and likely to cause spatial disorientation, the court stated at page 228:

" \* \* \* There is ample evidence that the Austin approach controller gave instructions to the pilot which could be reasonably and safely accomplished and which were reasonably calculated to provide assistance to the pilot."

The same cannot be said of the instant case.

In *Ingham v. Eastern Air Lines, Inc.*, *supra*, negligence was found in the failure to report to a pilot a decrease in visibility from one mile to three-quarters of a mile. The court held that this was a proximate cause of the crash because:

" \* \* \* if the crew had been notified of the changing weather conditions,

the pilot *might* have decided to divert to Philadelphia rather than to attempt an ILS landing at Idlewild. Moreover, the judge observed, if the crew had known of current conditions, they *might* have maneuvered the plane differently, and could have been ready and able at an earlier time to execute a missed approach." (Emphasis added)  *Id.* 236.

The clear import of *Ingham, supra,* from a proximate cause standpoint, is that the court permitted a lack of knowledge on the pilot's part to equal a different decision in the handling of the airplane, even though there was, of course, no way of determining that the knowledge would actually have made a difference in the pilot's handling. In the instant case, the visibility had decreased from the time of 91L's take-off at 2:30 A.M. so that by 2:54 A.M., when 91L first contacted the tower, the visibility had gone from three miles and no rain, to two and one-half miles and light rain showers. This information was never communicated to 91L. Had 91L known this and further known that there were tops at 5,000 or thereabouts, or that the controller could radar-vector him to Wilkes-Barre, it is reasonable to believe that 91L would not have attempted landing at Allentown. He "might" have diverted to Wilkes-Barre or he "might" have maneuvered the plane differently. As to visibility, the court in *Ingham* said at page 235:

" \* \* \* In our view, a drop in visibility of 25%, from one mile to three-quarters of a mile, bringing existing weather conditions *dangerously close* to landing minimums, is such a critical change that, in the interests of safety, it should have been reported to the crew of EAL 512." (Emphasis added)

So here, Rothschild should have been advised of changing visibility. In addition, the *Ingham* case is important in expressing a legal proposition as to the Government's duties as to passengers, and *by extension, to those residing on the ground.* That proposition is:

"Our conclusion that the change in visibility should have been reported is in

tune with the heavy degree of reliance which passengers place upon the government for insuring the safety of their flights. While air travel in this jet age has become commonplace, we know too well that there is always lurking the possibility of tragic accidents capable of snuffing out the lives of hundreds in a mere matter of seconds. Much of the success in preventing such disasters can be attributed to the federal government's assumption of the supervision of commercial flying; and public confidence in air travel has been fostered in large measure by knowledge that our government, recognizing the high stakes involved, is constantly overseeing the carrier's operations in order to promote safety."[6]

The defendant attempts to distinguish *Ingham* in contending that no emergency existed in *Ingham*. This avails the defendant nothing because the existence of a known emergency heightens the duties and responsibilities of a controller. It does not diminish them.

The defendant has also quoted *Air Crash Disaster at New Orleans, etc., supra,* as authority for the proposition that "FAR's have the force and effect of law and have assigned the ultimate responsibility for the operation of aircraft to the pilot, not to air traffic controllers on the ground". The defendant apparently would have us conclude that this case changed the "concurrent responsibility" rules discussed in *Spaulding, supra; Freeman v. United States, supra;* and *United States v. Miller, supra.* It does not do so. Indeed, *Air Crash, supra,* repeats the concurrent negligence rule and cites the above three cases, saying " * * * [T]he law requires both pilots and controllers to employ reasonable or due care". (See page 276) A careful analysis of the case supports the plaintiff's, not the defendant's, contentions. There, smoke and ground fog had reduced visibility to six hundred feet at Moisant Field. A DC–3, carrying a charter flight of hunters, and a crew of three,

crashed on landing. Plaintiffs argued that since the controller at Moisant knew that another airport was open, the controller had a duty to suggest the other airport. However, the pilot had been warned several times of the bad weather and the court found that:

> " * * * There was an expectation of clearing at Moisant sometime around 9 a. m. and there is a definite indication on a transmission from the pilot to the Houston controller that the DC–3 planned to hold until then if it could not land immediately. * * *" *Id.* 273.

Therefore, there was no apparent need to make a suggestion of another field. Also, the pilot never inquired about another field for landing although Houston had supplied alternate landing sites that it (Houston) knew to be open. The court held that under the circumstances it could find no legal duty on the part of the controllers at Moisant to inform the DC–3 about the other airports until some inquiry was made *or some emergency appeared.* In the instant case, the emergency had admittedly appeared. In *Air Crash,* negligence on the part of the controller was found, but because the negligent transmission occurred while the plane was twenty-five miles, and more than ten minutes from the airport, and the negligent transmission was followed by a proper transmission, the situation was corrected. In the instant case no transmissions were corrected.

Defendant attempts to distinguish *Stork v. United States, supra,* and treats it as a unique case. It is not unique. It may represent an early appearance of the ultimate demise of the exclusive "pilot-in-command" defense and the advent of the recognition of the concurrent responsibilities of both pilots and controllers. *Stork* was an excellent vehicle for the assertion of the "pilot-in-command" defense, and the Government's failure to sustain the defense highlights the extent to which the courts have gone to reject that defense. In *Stork,*

---

**6.** This language was written in 1968 and, of course, prior to the series of recent disasters and grounding of certain aircraft, killing as many as 273 persons in a single accident which, at least temporarily, has lessened public confidence in air travel and in the supervision and overseeing thereof.

the weather was terrible. The bad conditions were admittedly known to the pilot. He was sitting on the runway intending to take off. He had been fully briefed on the weather and he could see it. He requested clearance to take off and it was granted. He crashed solely because of the poor visibility. The defendant argued that the ATCM did not give it authority to deny take-off clearance. However, the court was of the opinion that controllers cannot sit passively by and watch someone commit a negligent act, or a grossly negligent act, without attempting to do something by way of a warning to dissuade the actor. The court quoted with approval the language of *United States v. Furumizo*, 381 F.2d 965 (9th Cir. 1967), at page 1108:

"'* * * (T)he regulations and manual do not make mere automata of the controllers. Their job requires that they act in the interests of safety. * * *'"

The *Stork* court went on to add:

"For the pilot here to request clearance for take-off under the circumstances was clear indication to the tower that something was amiss as a consequence of which the lives of passengers and crew were in grave danger and that warning was required. Any assumptions on which deference to the judgment of the pilot can normally rest were refuted by the events themselves." (page 1108)

Further, on the question of proximate cause, the court had no difficulty even though there was no evidence that a warning would have absolutely stopped the take-off. The court said:

"* * * It is clear from the record that take-off was in reliance upon the unqualified grant of clearance by the tower, and that even the *most cursory statement of caution* might have caused the pilot to abandon the fatal take-off. It was sufficient in *Ingham v. Eastern Airlines, Inc., supra,* that the availability of further weather information might have caused the pilot there to decide to abandon his attempt at landing." (Emphasis added) (p. 1108).

In the instant case, considering the pilot's lack of landing abilities, the weather, the

ceiling, the reduced visibility and the rain, advice as to these conditions, with appropriate cautionary statement, should have been given to the pilot. Additionally, as previously stated, through Pireps, contact with New York Center, the Wilkes-Barre tower and the Weather Bureau, information as to the "tops" to Wilkes-Barre should have been obtained, the pilot cautioned as to the difficulties of an ABE landing and given sufficient information to exercise an informed option to vector to Wilkes-Barre and land there in VFR conditions.

## VIII

### CONCLUSION

The foregoing shall constitute our findings of fact and conclusions of law.

Because of the complexities of the case and the extended and protracted trial, the issues as to liability and damages were bifurcated and the assessment of damages remains to be completed after further hearing.

Accordingly, we find in favor of the plaintiffs and against the defendant. Judgment will be entered in favor of the plaintiffs and against the defendant upon submission of appropriate order. Jurisdiction will be retained for the purpose of determining damages.